**MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Petitioner,**

v.

**AB FORTIA, Pharmacia AB, Pharmacia Fine Chemicals AB, Pharmacia, Inc. and U.S. International Trade Commission, Respondents.**

**Appeal No. 84–1766.**

United States Court of Appeals, Federal Circuit.

Oct. 7, 1985.

David E. Brook, Hamilton, Brook, Smith & Reynolds, of Lexington, Md., and Harvey Kaye, Lalos, Leeds, Keegan, Lett, Marsh, Bentzen & Kaye, Washington, D.C., argued for petitioner. With them on brief were James M. Smith and Leo R. Reynolds, of Hamilton, Brook, Smith & Reynolds, Lexington, Md., and David S. Klontz, of Lalos, Leeds, Keegan, Lett, Marsh, Bentzen & Kaye, Washington, D.C.

Maurice B. Stiefel, Stiefel, Gross, Kurland & Pavane, P.C., New York City, argued for respondent AB. With him on brief were Marc S. Gross, Thomas C. Pontani and James A. Quinton, New York City.

Wayne W. Herrington, Office of Gen. Counsel, U.S. Intern. Trade Com'n, Washington, D.C., argued for respondent Intern. Trade Com'n. With him on brief were Lyn M. Schlitt, Gen. Counsel and Michael P. Mabile, Asst. Gen. Counsel, Washington, D.C.

Before MARKEY, Chief Judge, and FRIEDMAN, and RICH, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the final decision of the United States International Trade Commission (Commission or ITC) in *Certain Limited-Charge Cell Culture Microcarriers,* Investigation No. 337–TA–129, an investigation under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (section 337), determining that there was no violation of section 337 by the importation of certain biological cell culture products by respondents AB Fortia, Pharmacia AB, et al. We affirm.

## Background

Cell culture technology is concerned with the development of the most efficient and safe or hygienic means of growing different types of cells, which are important for the production of cell growth by-products, including viral agents for vaccines, interferon, and hormones. Mammalian cells in particular are used to synthesize many valuable proteins. In many cases, the best or only source of these proteins is culturing the mammalian cells known to produce them. Interferon, for example, is a glycoprotein product of certain mammalian cells such as fibroblasts (connective tissue) or lymphocytes (white blood cells).

Culturing mammalian cells on a large scale requires strict nutritional and environmental controls. Among these environmental requirements is the need for a solid surface or substrate on which the cells can grow. The majority of mammalian cells are thus said to be "anchorage-dependent." One technique for culturing anchorage-dependent cells on a large scale involves the use of cell culture "microcarriers," which are microscopic beads suitable for cell attachment and growth.

The earliest microcarrier culture system was developed in the Netherlands by Dr. Anton L. van Wezel, conceded to be the "father" of microcarriers, and was reported in the journal *Nature* in 1967. In this research, Dr. van Wezel employed commercially available anion exchange resin beads, specifically respondent Pharmacia's DEAE-Sephadex A–50 (A–50) beads, which he called "microcarriers." As a result of the positively charged amino (diethylaminoethyl, or DEAE) groups attached to the beads, these A–50 beads have a positive ionic charge on their surfaces. The amount of positive charge is known as the "total charge capacity." Mammalian cells, which are negatively charged, attach and grow on the A–50 beads because of the positive charge groups.

When Dr. van Wezel attempted to increase the concentration of A–50 beads in his cell cultures, he encountered problems that he characterized as the "toxicity phe-

nomenon," and reported these in a 1969 article in the journal *Biotechnology and Bioengineering.* Although van Wezel experimented with beads having a lower total charge capacity than the A–50 beads in an attempt to overcome the toxicity phenomenon, he reported in a 1973 article that the toxicity problem could best be overcome by coating the beads with a negatively charged polyanion, nitrocellulose.

## The MIT Patents

Research at Massachusetts Institute of Technology (MIT) in the microcarrier field was initiated as a result of a National Science Foundation grant in 1974. In September, 1975, David Levine of the MIT research team delivered an oral presentation in Birmingham, Alabama, printed copies of which were distributed to a number of scientists (the "Birmingham paper"), which indicated that optimal cell adhesion and growth could be obtained by reducing the total charge capacity of microcarriers such as the A–50 beads.

In December, 1975, the MIT group observed that significantly improved cell growth was occurring on synthesized microcarriers that had total charge capacities[1] considerably lower than the A–50 beads. Further experiments by the MIT group indicated that the appropriate charge capacity range was 0.1 to 4.5 microcarrier charge milliequivalents (meq) per gram. Microcarriers having charge capacities within this limited range were termed "limited-charge cell culture microcarriers."

The MIT group filed a patent application covering the development of limited-charge cell culture microcarriers on November 11, 1976, and on October 19, 1977, filed a continuation in-part (C–I–P) application that included experimental results obtained subsequent to the filing of the parent application. The claims in the C–I–P application pertained to the use of limited-charge (0.1 to 4.5 meq/gram, measured on the MIT basis) cell culture microcarriers to grow anchorage-dependent cells and to produce cell-growth by-products. The C–I–P application issued as U.S. Patent No. 4,189,534 ('534 patent) on February 19, 1980. The parent application was restricted to claims directed to the microcarriers *per se,* and a divisional application with those claims issued as U.S. Patent No. 4,293,654 ('654 patent) on October 6, 1981.

To commercially develop its microcarrier technology, MIT licensed Flow General, Inc., under the '534 and '654 patents. Flow General and its subsidiary Flow Laboratories (collectively, "Flow") are located in McLean, Virginia, and manufacture and sell products for cell culturing, including media and sera required for cell growth. The microcarriers involved in the process at issue here were actually manufactured in Scotland. Flow Laboratories, Ltd., Flow's subsidiary in Scotland, purchased the commercially available uncharged Sephadex

1. The term "charge capacity" is borrowed from ion exchange bead technology. The capacity of an ion exchanger is a quantitative measure of its ability to take up (bind with) exchangeable counter ions and is determined by (1) the total number of charged groups attached to the bead and (2) the accessibility of the charged groups to the counter ions. Capacity may be expressed as "total capacity" or "available capacity." The "total capacity" is the amount of charged or potentially charged groups per gram throughout the matrix of dry ion exchange beads, regardless of whether they are actually available for binding. The "available capacity" is the actual charge capacity obtainable under specified experimental conditions; it is a measure of the number of charged groups actually available for taking up counter ions. The "available capacity" is thus actually less than the theoretical "total capacity."

The MIT group expresses "charge capacity" in the claims of its patents in terms of milliequivalents (meq) per gram of dry, untreated microcarriers (the "MIT basis"). This method of expressing charge capacity is unique to MIT's patents. The conventional method of expressing the charge capacity of ion exchange beads is in terms of meq per gram of polymer beads after treatment (the "conventional basis"). Both methods of measuring refer to "total capacity." The difference is that in the context of the MIT patents, the "untreated" microcarrier is the entire microcarrier minus the charge-supplying groups, while the conventional basis of measuring includes the weight of the charge-supplying moieties in its denominator. The conventional basis of measuring charge capacity thus results in a slightly lower value than the MIT basis.

G–50 beads from Pharmacia, to which the positively charged DEAE groups were attached. The microcarriers were bottled in Scotland, then shipped to the United States for final quality control testing.

MIT later agreed to a modification of its original agreement with Flow, effective January 1, 1981, that appointed Flow as the exclusive licensing agent for MIT in regard to limited-charge cell culture microcarrier technology, in return for which Flow guaranteed minimum annual royalties to MIT of $400,000.

### The Section 337 Investigation

The ITC investigation under review here was initiated on July 19, 1982, based on a complaint filed under section 337 by MIT and Flow. Pharmacia AB (formerly known as AB Fortia), Pharmacia Fine Chemicals AB, all of Upsala, Sweden, and Pharmacia, Inc., of Piscataway, New Jersey (collectively, "Pharmacia"), were named as respondents.

Pharmacia imports three microcarrier products into the United States. Their "Cytodex" microcarriers admittedly have a total charge capacity of 0.1 to 1.5 meq/gram, measured on the conventional basis. MIT's complaint alleged that Pharmacia's microcarriers infringed MIT's '534 and '654 patents and that their importation from Sweden constituted unauthorized manufacture abroad. As a result of MIT's complaint, the Commission initiated this investigation, made its final determination on November 18, 1983, and issued a written opinion on November 22, 1983.

### The Commission Decision

The Commission determined there was no violation of section 337 because the '534 and '654 patents were invalid and because, to the extent there was "an industry ... in the United States" within the meaning of section 337, the importation and sale of Pharmacia's Cytodex microcarriers did not substantially injure that industry.

Based upon an examination of the scope and content of the prior art and the patent claims, the Commission concluded that the inventions claimed in the '534 and '654 patents would have been obvious. The Commission noted that the prior art A–50 ion exchange beads were "well-known to be useful as cell culture microcarriers," and that the only difference between the A–50 beads and the claimed microcarriers "is the lower charge capacity of the latter." The "toxicity phenomenon" noted by van Wezel with respect to high concentrations of A–50 beads was known to have been overcome by pretreatment with serum or a polyanion, such as nitrocellulose. The Birmingham paper expressly stated that to reduce the total charge capacity of the A–50 beads would have the same effect as the pretreatment. Finally, the Commission noted that the prior art clearly showed how to achieve this reduced charge capacity, and also indicated that anion exchange beads with such a reduced charge capacity were already commercially available. On this basis, the Commission concluded that the claimed inventions would have been obvious.

The Commission also found that there were two separate industries under the two MIT patents because microcarriers (covered by the '654 patent) and cell growth by-products (covered by the '534 patent) were distinct commercial products. Specifically, the Commission found that operations under the '654 patent were not "an industry ... in the United States" because all of Flow's microcarriers were manufactured in Scotland and the nature and significance of Flow's activities in the United States with respect to them did not justify treatment as "an industry in the United States." The second industry, defined in terms of operations under the '534 patent (covering the process of using the '654 microcarriers to grow mammalian cells and recover cell growth by-products), was found to be "an industry" within the meaning of section 337, because Flow manufactured the cell growth by-product interferon in the United States using the '534 patent. However, because Pharmacia did not import cell growth by-products made by the '534 process, the Commission found there could be no injury to the industry.

## OPINION

### Section 337

Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, provides in relevant part: (a) Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect of which is to destroy or substantially injure an industry, efficiently and economically operated in the United States, or to prevent the establishment of such an industry ... are declared unlawful....

 Patent infringement and unauthorized importation of a product manufactured abroad by means of a process covered by the claims of an unexpired, valid United States patent are unfair acts or methods of competition under section 337. Defenses to a charge of unfair competition under section 337 thus include both non-infringement and invalidity of the patent(s) at issue, as well as proof that the acts involved do not "substantially injure an industry ... in the United States." *See* 19 U.S.C. § 1337(a).

### Patent Invalidity

The Commission's determination that the patents involved in this investigation are invalid was based on a legal conclusion that the inventions claimed in both the '534 and '654 patents were "obvious." 35 U.S.C. § 103 states that "[a] patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art...." Here, the Commission correctly stated that under *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), obviousness is determined by examining the scope and content of the prior art and ascertaining the differences between the prior art and the claims at issue. In the proceedings before the Commission as well as before this court, MIT premised its assertions of nonobviousness largely on claim

1 of the '654 patent, permitting the validity of the '534 patent to stand or fall with the '654 patent.

Claim 1 of the '654 patent reads:

Cell culture microcarriers having a degree of substitution thereon with positively-charged chemical moieties sufficient to provide a charge capacity of from about 0.1 to about 4.5 meq/gram of dry, untreated microcarriers.

In examining the scope of the prior art, the Commission identified several references as "most pertinent" in concluding that the claimed inventions were obvious. The Commission first noted that the claimed microcarriers were essentially identical to the prior art DEAE-Sephadex A–50 ion exchange beads, which were well-known to be useful as cell culture microcarriers. The only difference between the prior art A–50 beads and the claimed microcarriers is the lower charge capacity of the latter.

The Commission then examined the work of Dr. van Wezel, noting that the "toxicity phenomenon" he disclosed in 1969 was known to have been overcome by pretreating or coating the A–50 beads with serum or a negatively-charged polyanion, such as nitrocellulose or carboxymethylcellulose. This coating procedure was described in detail in a 1973 article by van Wezel.

The Commission also considered the Birmingham paper as prior art. The Birmingham paper teaches that a reduction in the total charge capacity, specifically that reducing the total charge capacity of the A–50 beads, "would have the same effect" as the pretreatments described by Dr. van Wezel and others.

The Birmingham paper was orally presented by Dr. Levine of the MIT group to the First International Cell Culture Congress in Birmingham, Alabama, September 21–25, 1975. The conference was attended by 50 to 500 cell culturists. Prior to the conference Dr. Levine gave a copy of the paper to the head of the conference. Afterward, copies were distributed on request, without any restrictions, to as many

as six persons, more than one year before the filing date of the '534 and '654 patents.

MIT argues that the Birmingham paper is not prior art because it is not a "printed publication" within the meaning of 35 U.S.C. § 102(b). The Commission, however, concluded that it was a "printed publication," relying on two cases decided by each of our predecessor courts, *Garrett Corp. v. United States*, 422 F.2d 874, 190 Cl.Ct. 858, 164 USPQ 521 (Ct.Cl.1970), and *In re Wyer*, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

In *Garrett*, the reference involved was a report of a British government agency. As in this case, there was no question that the reference was "printed," only whether it was a "publication." Copies of the reference in question were distributed without restriction to various British and American government agencies, as well as to six commercial companies. The Court of Claims held that "[w]hile distribution to government agencies alone may not constitute publication, distribution to commercial companies without restriction on use clearly does." 422 F.2d at 878, 190 Cl.Ct. at 865, 164 USPQ at 524.

In *Wyer*, appellant's application for an Australian patent resulted in copies of that application being classified and laid open to public inspection at the Australian Patent Office and its five "sub-offices" over one year before appellant filed his application in the United States. The Court of Customs and Patent Appeals held that what occurred in the Australian Patent Office resulted in the production of a "printed publication" within the meaning of § 102(b), basing its conclusion on the principle that a document may be deemed a printed publication

> upon a satisfactory showing that it has been disseminated or otherwise made available to the extent that persons interested and of ordinary skill in the subject matter or art, exercising reasonable diligence can locate it and recognize and comprehend therefrom the essentials of

the claimed invention without need of further research or experimentation.

655 F.2d at 226, 210 USPQ at 794.

■ We agree with the ITC's conclusion that the Birmingham paper is prior art. As the Commission noted, between 50 and 500 persons interested and of ordinary skill in the subject matter were actually told of the existence of the paper and informed of its contents by the oral presentation, and the document itself was actually disseminated without restriction to at least six persons.

In addition to the work of Dr. van Wezel and the Birmingham paper, the Commission also considered another patent, issued on July 19, 1977, to three members of the MIT group, entitled "Treatment of Cell Culture Microcarriers," U.S. Patent No. 4,036,093 ('093 patent). The patent discloses a method of treating positively charged microcarriers, in particular the prior art A–50 beads, by coating them with negatively-charged anions, thereby "overcoming deleterious effects which prevent good cell growth." The '093 patent thus teaches that treating the A–50 beads results in better cell growth than using untreated A–50 beads. By implication, the '093 patent thus necessarily teaches that lower actual charge capacity A–50 beads will result in better cell growth.

Finally, the Commission looked at Canadian Patent No. 651,507, issued October 30, 1962, to respondent Pharmacia, and at two commercially available prior art products, Whatman DE–52 and Servacel DEAE–32 ion exchange beads, to show that the process of producing ion exchange beads having a total charge capacity in MIT's claimed range was known at the time MIT's claimed inventions were made. These beads are identical in all essential respects to the claimed invention except that there is no evidence that anyone attempted to grow cells on them prior to the date of the MIT patents.

■ We agree with the Commission's determinations that the '534 and '654 patents are invalid for obviousness.

Our conclusion of patent invalidity is dispositive of all other issues in this case. We therefore do not reach the other portions of the Commission decision appealed from, namely, whether Pharmacia's Cytodex microcarriers infringe the '654 patent and whether there was substantial injury to "an industry ... in the United States."

CONCLUSION

The Commission's determination that there was no violation of section 337 is *affirmed.*

AFFIRMED.