**NORTHERN TELECOM, INC.,**
Plaintiff–Appellant,

v.

. DATAPOINT CORPORATION,
Defendant/Cross–Appellant.

Nos. 89–1034, 89–1035.

United States Court of Appeals,
Federal Circuit.

June 29, 1990.

Suggestion for Rehearing In Banc
Declined Aug. 27, 1990.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued, for plaintiff-appellant. With him on the brief, was J. Michael Jakes. Also on the brief, were George W. Whitney, Henry Y.S. Tang and Richard S. Clark, Brumbaugh, Graves, Donohue & Raymond, New York City, of counsel.

Jerry R. Selinger, Baker, Mills & Glast, Dallas, Tex., argued, for defendant/cross-appellant. With him on the brief, were Andrew S. Viger and Martha E. Waters.

Before MARKEY,* NEWMAN and ARCHER, Circuit Judges.

PER CURIAM.

Northern Telecom, Inc., successor-in-interest to Sycor, Inc. (together herein "Sycor"), appeals the decision of the United States District Court for the Northern District of Texas. *Northern Telecom, Inc. v. Datapoint Corp.*, No. CA3–82–1039–D, 1988 WL 156280 (N.D.Tex. Aug. 31, 1988). Datapoint Corporation has filed a cross-appeal. At issue are the validity and enforceability of United States Patent No. 3,760,-375 ("the '375 patent"), and infringement by Datapoint.

We affirm the district court's holding that certain claims had not been proved invalid under 35 U.S.C. §§ 102 and 103, that certain claims are infringed, and that certain claims are invalid for failure to comply with the best mode requirement of 35 U.S.C. § 112. We reverse the district court's holdings of invalidity for failure to comply with the enablement requirement of 35 U.S.C. § 112. We reverse the equitable determination of unenforceability based on inequitable conduct.

## The Invention

The '375 patent, entitled "Source Data Entry Terminal", inventors Samuel N. Irwin and Michael R. Levine, relates to a mode of "batch processing" of data. In batch processing, data are entered by the operator and stored, off-line,[1] the operator not interacting with the computer but simply with the batch data entry device.

Batch data preparation and entry were not new. Systems in common use at the time this invention was made included the IBM punch card, the paper tape punch, and the key-to-magnetic tape recorder. The invention of the '375 patent, a programmable processor-based batch data entry terminal, provided an improved way of entering, verifying, and storing data. Entry and verification of data at the source by persons who understand the data removes a source of error in data processing. The inventors built a major business on the invention of the '375 patent.

In accordance with the '375 invention, the data are keyed into a form that is displayed on the screen; the operator is guided by names and instructions on the screen; and certain entries are subject to automatic as well as visual checks and edits. A storage area, or buffer, holds the data as it is entered and, when the buffer holds a complete and correct record, the data are transferred to a magnetic tape cassette.

---

* Circuit Judge Markey vacated the position of Chief Judge on June 27, 1990.

1. "Off-line" means not actively connected to the computer, in contrast to "on-line", wherein the terminal is connected by a communication link so that signals are transmitted directly between the terminal and the computer.

Sycor filed suit charging Datapoint with infringement of the '375 patent. Datapoint raised numerous defenses and counterclaims. The cause was vigorously litigated, the trial taking seventy days over a six-month period. The district court issued extensive findings of fact and conclusions of law, in a 219 page opinion. Each side appeals certain of the issues that were decided adversely to it.

# I

## *Obviousness—35 U.S.C. § 103*

Datapoint appeals the district court's determination that Datapoint did not prove by clear and convincing evidence facts requiring a holding that claims 35–37, 40–42, and 44 are invalid under § 103. Datapoint also raises the issue of invalidity under § 103 of claims 19, 20, and 25–28.

Datapoint relies as prior art on the Lincoln Laboratory Instrument Computer (LINC), developed in 1962 by expert witness Professor Clark, running the Patient Interview program, written by a Dr. Slack. The LINC is described as a stored program computer designed for laboratory use, consisting of a keyboard for data entry and commands to the computer, an electronics cabinet, an oscilloscope information display, and reel-to-reel digital magnetic tape units for storing data and programs.

## *Claims 40–42 and 44*

Claim 40 is as follows:

40. A method of implementing a source data entry terminal device, comprising the steps:

connecting selected input/output peripheral components including at least a keyboard data entry means and a visual data display means to a buffer memory and to a central processor organization, and using said buffer memory for temporary storage of data entered by said keyboard means;

incorporating control logic for all such peripheral components in the central processor and controlling each such component by the central processor, such that said peripheral components need have substantially no local control logic of their own;

and dedicating the terminal to a given operational configuration by incorporating a fixed program in said central processor.

Claims 41, 42, and 44 are dependent upon claim 40, and contain additional limitations.

The district court found that the final step of claim 40, requiring a fixed program, differed from the LINC because the LINC did not employ a fixed program. Datapoint contends on this appeal, as it did at trial, that this difference is a "routine design choice".

Sycor does not dispute that fixed programs are not new: inventor Irwin, in his testimony, gave the example of a calculator. Sycor describes the invention of the '375 patent as a new combination of known steps and elements, that provides a new and commercially successful solution to the problems of batch data entry. Sycor states that this combination was not taught or suggested by the prior art, including the LINC and the LINC as modified by the Patient Interview program.

It is insufficient that the prior art disclosed the components of the patented device, either separately or used in other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143, 227 USPQ 543, 551 (Fed.Cir.1985) (insufficient to select from the prior art the separate components of the inventor's combination, using the blueprint supplied by the inventor); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546, 221 USPQ 1, 7 (Fed.Cir.1984) ("As this court has held, 'a combination may be patentable whether it be composed of elements all new, partly new or all old'") (citations omitted); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1551, 220 USPQ 303, 312 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) (individual references can not be "employed as a mosaic to recreate a facsimile of the claimed invention.") The district court found that the technolo-

gy for the invention claimed in the '375 patent existed at the time the invention was made, but correctly declined to engage in hindsight reconstruction of the claimed invention.

Datapoint argues that the differences between the LINC and the '375 invention are "trivial". The district court observed that the prior art failed to teach the combination and its use as set forth in the '375 patent, and stated that the invention's "commercial success, although not determinative of the issue, is some indication that the '375 patent was not [sic: invention would not have been] obvious", the court referring to *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966).

The prior art does not suggest the Irwin/Levine solution of the '375 invention to the batch data entry problem. As discussed in *In re Rothermel*, 276 F.2d 393, 397, 125 USPQ 328, 332, 47 CCPA 866 (1960), the nature of the problem "which persisted in the art", and the inventor's solution, are factors to be considered in determining whether the invention would have been obvious to a person of ordinary skill in that art. *See also, e.g., Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556, 225 USPQ 26, 31 (Fed.Cir.1985) (the prior art must suggest to one of ordinary skill in the art the desirability of the claimed combination). Whether the changes from the prior art are "minor", as Datapoint argues, the changes must be evaluated in terms of the whole invention, including whether the prior art provides any teaching or suggestion to one of ordinary skill in the art to make the changes that would produce the patentee's method and device. *Lindemann Maschinenfabrik GmbH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1462, 221 USPQ 481, 488 (Fed.Cir.1984).

We affirm the district court's holding that claims 40–42 and 44 had not been proved invalid on the grounds raised.

### Claims 35–37

■ Claims 35–37 are dependent on claims 29 and 30, and include their limitations, as follows:

29. A method of source data capture, comprising the steps:

generating coded signals representative of alpha-numeric source data desired to be captured;

visually displaying the data of which said signals are representative by use of such signals;

using a buffer memory to temporarily store the data being displayed;

and recording the data on magnetic tape after the data has been visually displayed.

30. The method of claim 29, including the step of using a program format to generate said data-representative signals in a predetermined relative sequence, and visually displaying said data in such sequence.

35. The method of claim 30, wherein said format is used by recording it on magnetic tape and reproducing the record format prior to actual use.

36. The method of claim 35, wherein said format is recorded on magnetic tape enclosed within cassette tape cartridges, of the basic type conventionally used for audio recording.

37. The method of claim 35, wherein the format recorded on said tape is loaded into a buffer memory by replaying the tape, and the format is held in such buffer during data entry.

Datapoint asserts that claims 35–37 do not differ from the LINC with the Patient Interview program, except in trivial detail. The district court analyzed these differences. As to claim 35, the court found: "The evidence is insufficient in addressing whether the program format of the [Patient Interview] program was held in a buffer memory. The court would have to draw unwarranted inferences from the evidence to conclude otherwise."

While invalidity is a question of law, the party asserting invalidity must by clear and convincing evidence establish facts supporting a conclusion of invalidity, and asserted inferences of fact must similarly be supported to meet this standard. Datapoint has not shown that the district court

clearly erred in refusing to draw such inferences.

As to claim 36, Datapoint argues that Sycor's choice of cassette tapes to record data as opposed to the reel-to-reel system used in the LINC was "an obvious design choice." Sycor states that the use of cassette tapes in the '375 invention was a significant aspect of the '375 invention as a whole, and there was extensive evidence supporting this position. Datapoint does not show that the prior art suggests the Sycor combination. *Rosemount*, 727 F.2d at 1546, 221 USPQ at 7.

Datapoint has not by clear and convincing evidence established facts requiring the conclusion that the subject matter of claims 35–37 would have been obvious in terms of § 103. The holding of the district court in respect of claims 35–37 is affirmed.

### Claims 19, 20, 25–28

The parties dispute whether Datapoint adequately raised the issue of the validity of claims 19, 20, and 25–28, based on the LINC as prior art. In view of our holding that these claims are invalid on other grounds, see Part V, *infra*, we do not consider this issue.

### II

### Anticipation—35 U.S.C. § 102(b)

 Datapoint challenges the district court's finding that claims 40–42 and 44 were not anticipated by certain "AESOP–B" documents because these documents were not "printed publications" in terms of 35 U.S.C. § 102(b)[2]. Whether a document is a "printed publication" is "a legal determination based on underlying fact issues". *In re Hall*, 781 F.2d 897, 899, 228 USPQ 453, 455 (Fed.Cir.1986).

The AESOP–B was a complex military system for on-line distributed computer processing of logistical data such as the positions of aircraft. The documents in question are four reports on aspects of this system, identified as exhibits DX–2 through DX–5. The reports DX–2 through DX–5 were not under security classification, and were distributed to approximately fifty persons or organizations involved in the AESOP–B project. Document DX–5 contained the legend "Reproduction or further dissemination is not authorized ... not for public release." The district court found that documents DX–2 through DX–4 "may have" contained such notices, the court finding that they "were of the class of documents that would have been distributed with such a notice." The documents were housed in a library at the Mitre Corporation, the company having principal responsibility for developing AESOP–B. Access to the library was restricted to persons authorized by Mitre.

A document, to serve as a "printed publication", must be generally available. *Garrett Corp. v. United States*, 422 F.2d 874, 878, 164 USPQ 521, 524, 190 Ct.Cl. 858 (1970) ("While distribution to government agencies and personnel alone may not constitute publication ... distribution to commercial companies without restriction on use clearly does.") *See Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109, 227 USPQ 428, 432 (Fed. Cir.1985) (paper orally presented at a scientific meeting open to all persons interested in the subject matter, with written copies distributed without restriction to all who requested it, is a printed publication); *In re Wyer*, 655 F.2d 221, 226–27, 210 USPQ 790, 795 (CCPA 1981) (foreign patent applications that are made known to and are available to the public without restriction are publications).

The district court, referring to "the uncertainties of public access to the AESOP–B documents", found that Datapoint had failed to prove by clear and convincing evidence facts requiring a conclusion that these documents were "sufficient as prior publications, descriptive of the AESOP–B". The district court was unable to find that

---

**2.** **35 U.S.C. § 102:** A person shall be entitled to a patent unless

 (b) the invention was patented or described in a printed publication ... more than one year

prior to the date of the application for patent in the United States.

anyone could have had access to the documents by the exercise of reasonable diligence. *See Massachusetts Inst., supra.* We are unpersuaded that the evidence shows otherwise. Accordingly, we affirm that these documents were not printed publications.

Because the documents were not as a matter of law printed publications, we do not reach the issue of whether the AE-SOP–B system disclosed all the limitations of claim 29, on which claims 35–37 depend.

The district court's holding that claims 40–42 and 44 were not shown to be invalid under § 102(b) is affirmed.

## III

### *Inequitable Conduct—The Rule 312 Amendment*

 The district court held all the claims of the '375 patent unenforceable based on inequitable conduct before the Patent and Trademark Office ("PTO"). On appellate review we apply the abuse of discretion standard. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988) (*in banc* clarification of precedent). Abuse of discretion may obtain when the ruling reflects an erroneous application or interpretation of law, or shows a clear error of judgment, or is based on clearly erroneous factual findings. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1245–46, 9 USPQ2d 1913, 1928 (Fed.Cir.1989); *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985).

### A

The basis for the district court's ruling of inequitable conduct was the filing of an "Amendment Under Rule 312" during prosecution of the patent application that led to the '375 patent.

During prosecution the examiner had objected to the application on various grounds, but eventually allowed the claims substantially as filed. After the PTO issued the notice of allowance, but before payment of the issue fee, Sycor requested amendment of the descriptive text of the patent application as authorized by PTO Rule 312, 37 C.F.R. § 1.312 (1969), which provided as follows:

§ 1.312. Amendments after the notice of allowance of an application will not be permitted as a matter of right. However, such amendments may be made if filed not later than the date the issue fee is paid, on the recommendation of the primary examiner, approved by the Commissioner, without withdrawing the case from issue.

Sycor filed a four-page amendment under Rule 312, containing twenty-five specific changes to the specification. In explanation Sycor's patent attorney wrote:

The present amendment under Rule 312 is primarily for the purpose of correcting certain typographical errors and other such discrepancies noted in the specification upon a final review of the same, immediately prior to payment of the issue fee.

The errors and discrepancies sought to be corrected by this amendment were not noticed previously, and thus could not have been corrected before the present time; because the corrections merely add to the clarity and readability of the specifications [sic], entry of the amendment is believed to be in order and is solicited.

The district court held that five of the requested changes altered the scope of the original disclosure and the scope of the previously allowed claims. These five changes, as listed by the district court with the changes to the text underlined, were as follows:

(1) a wired *or like* read-only memory;
(2) read-only memory containing a hardwired *or otherwise fixed* program;
(3) a hardwired *or fixed* program;
(4) a wired *or like* ROM *of the form just mentioned* is unalterable;
(5) the wired-in (*or otherwise fixed*) program in the ROM.

The examiner had written "Entry Recommended" in the margin of the Rule 312 amendment, alongside the first two changes listed above. On the official PTO

form the box was checked "entered as directed to matters of form not affecting the scope of the invention."

The district court found that the attorney intentionally misrepresented the purpose and nature of these amendments, and that this misrepresentation was material to patentability.

### B

Sycor argues that the amendments simply conformed the descriptive text of the specification to the claims, as required by the rules of PTO practice, and thus could not, as a matter of law, broaden the disclosure and the scope of the claims. Sycor states that such concordance is routine, and indeed can be compelled by the examiner. Sycor argues that neither intent to deceive nor materiality has been shown, and that the examiner correctly entered the amendments.

The original claims as filed are part of the patent specification. 35 U.S.C. § 112, ¶ 2; *In re Benno,* 768 F.2d 1340, 1346, 226 USPQ 683, 686–87 (Fed.Cir.1985). At the time the Rule 312 amendment was filed the claims had already been examined and allowed substantially as filed, and the subject matter added to the descriptive text by amendment was already in the allowed claims. The Manual of Patent Examining Procedure ("MPEP") § 608.01(1) (3d ed., rev. June 1968) states:

§ 608.01(1) In establishing a disclosure, applicant may rely not only on the description and drawing as filed but also on the original claims if their content justifies it.

Where subject matter not shown in the drawing or described in the description is claimed in the case as filed, and such original claim itself constitutes a clear disclosure of this subject matter, then the claim should be treated on its merits, and *requirements made to amend* the drawing and description to show this subject matter. [emphasis added]

Although Datapoint's witnesses testified that the changes enlarged the scope of the claims, the claims as originally filed and as allowed were already of the challenged scope, and were already part of the disclosure. *Benno, supra. See Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 699, 218 USPQ 865, 871 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (the scope of the patent is determined by the claims).

The district court described the MPEP as requiring a "heightened showing" for entry of Rule 312 amendments which affect the disclosure, citing MPEP § 714.16, which states:

§ 714.16. As to amendments affecting the disclosure, the scope of any claim, or that add a claim, the remarks accompanying the amendment must fully and clearly state the reasons on which reliance is placed to show: (1) why the amendment is needed; (2) why the proposed amended or new claims require no additional research or examination; (3) why the claims are patentable and, (4) why they were not earlier presented.

The district court held that Sycor did not make the requisite statement of "reasons". The issue, however, is intent to deceive or mislead.

These amendments were not to the claims. The nature of these amendments was clear on their face, and the examiner was required to review them to determine whether they complied with law and practice. All the pertinent information was squarely before the examiner in a simple document. As stated in *Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1482, 1 USPQ2d 1241, 1247 (Fed.Cir. 1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987), "the examiner was free to reach his own conclusion...."

Although lapse on the part of an examiner does not exculpate an applicant whose acts are intentionally deceptive, *Kanga-ROOS U.S.A. v. Caldor, Inc.,* 778 F.2d 1571, 1576, 228 USPQ 32, 35 (Fed.Cir.1985), any doubt as to whether the examiner lapsed in his duty does not increase the burden on the applicant. Nor does the applicant's obligation of candor replace the examiner's duty to examine the claims. *Kingsdown,* 863 F.2d at 874 n. 8, 9 USPQ2d at 1390 n. 8.

Entry of a Rule 312 amendment requires both the recommendation of the primary examiner and approval by the Commissioner. 37 C.F.R. § 1.312, *supra.* The record shows that entry of these amendments was expressly approved. We do not think the attorney's words "typographical errors and other such discrepancies" in the introductory paragraphs of the amendment must be deemed to have diverted the examiner from mandatory review of the ensuing subject matter, in view particularly of the examiner's specific recommendation that the amendment be entered. It is presumed that public officials do their assigned jobs. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

The subjective nature of the factual determination of intent to deceive, which is the predicate to a holding of inequitable conduct, invites litigation and indeed had led to seemingly inconsistent decisions in the Federal Circuit. The district court here did not have the benefit of our guidance in *Kingsdown,* in which we sat *in banc* for the purpose, *inter alia,* of clarifying certain of our precedents. As stated therein:

> "Gross negligence" has been used as a label for various patterns of conduct.... We adopt the view that a finding that a particular conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive. *See Norton v. Curtiss,* 433 F.2d 779, 167 USPQ 532 [57 CCPA 1384] (CCPA 1970).

863 F.2d at 876, 9 USPQ2d at 1392.

The district court held that Sycor's misrepresentation of the nature of the amendment sufficed to support a holding of inequitable conduct before the Patent and Trademark Office. The district court described the attorney's communication as "disingenuous." The court stated that the "case law makes clear that, although a party's underlying conduct may be acceptable, that fact does not exculpate the party from an inequitable conduct finding [sic: holding] where the party misrepresented the nature of the underlying conduct to the PTO."

Intent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO. *Accord Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 186, 190 USPQ 273, 278 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). "A patentee's oversights are easily magnified out of proportion by one accused of infringement...." *Id.* 538 F.2d at 196, 190 USPQ at 286. Given the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.

When all of the circumstances are considered, including indications of good faith, we are left with a definite and firm conviction that a mistake has been made regarding Sycor's state of mind when it filed its Rule 312 amendment in the Patent and Trademark Office. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Kingsdown,* 863 F.2d at 876, 9 USPQ2d at 1392; *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1416, 5 USPQ2d 1112, 1116 (Fed.Cir. 1987) (intent must be determined in view of all the circumstances). Here, there was no failure of compliance with 37 C.F.R. § 1.118(a), which states that:

> § 1.118(a) All amendments to the specification, including the claims, and the drawings filed after the filing date of the application must conform to at least one of them as it was at the time of the filing of the application.

Even if Sycor's statement in its covering letter to the examiner was in error or negligent, the Rule 312 amendment was made as of right, authorized by MPEP § 608.01(l). This right weighs against an inference of intent to deceive the examiner into entering the amendment.

Accordingly, we conclude that the district court's finding that Sycor intended to mislead or deceive the Patent and Trademark Office is clearly erroneous. Thus we need not reach the question of materiality, for absent the element of intent the court's holding of inequitable conduct was legal error, and thus exceeded the court's discretionary authority. The holding of unenforceability on this ground is reversed.

## IV

### Inequitable Conduct—The Viatron 21 Device

■ Datapoint appeals the district court's ruling that Sycor did not commit inequitable conduct by not disclosing the Viatron 21 device to the patent examiner.

The patent applicant is required to advise the patent examiner of all information known to the applicant that "a reasonable examiner would consider important in deciding whether to allow the application to issue as a patent". 37 C.F.R. § 1.56(a) (1989). This requirement has grown in importance because of the highly technical nature of the subject matter of many patent applications, the difficulties inherent in searching the worldwide technical literature, and the unique knowledge that the applicant may hold.

According to Datapoint, the existence of the Viatron 21 device became known to inventor Irwin during the time that Irwin was working on the invention of the '375 patent, including knowledge that the Viatron 21 used a tape cassette, albeit in a different system for data processing.

The district court found that the Viatron 21 device was not available as prior art. Datapoint does not on appeal challenge that finding, but merely calls the Viatron 21 "prior art" in arguing that it should have been disclosed. Since the Viatron 21 device was not prior art, it was not material to patentability. *Environmental Designs*, 713 F.2d at 698, 218 USPQ at 870. Absent materiality, inequitable conduct for failure to disclose can not lie.

The district court's determination on this point is affirmed.

## V

### Best Mode—35 U.S.C. § 112

■ The district court held that claims 19–20, 22, and 24–28 of the '375 patent are invalid on the basis that Sycor concealed the best mode of carrying out the invention of these claims. Compliance with the best mode requirement is a question of fact, and is reviewed for clear error. *DeGeorge v. Bernier*, 768 F.2d 1318, 1324, 226 USPQ 758, 763 (Fed.Cir.1985).

One of the objectives of the disclosed invention was to capture data "on magnetic tape cassettes of the general type presently finding extensive and widespread usage in audio entertainment equipment, but never heretofore used in data-handling apparatus." (Col. 1, lines 59–63.) The specification also stated that the invention includes cassettes "of the type which are almost universally available for audio purposes." (Col. 3, lines 32–33.) The district court, however, found that Sycor knew, in advance of filing the patent application, that standard audio tape was not the best mode for carrying out the invention. This finding is amply supported by the testimony of a former Sycor Vice–President–Engineering who was an employee of Sycor at the time the patent application was filed, and by other evidence, that Sycor purchased tape and cassettes of its own design and specifications and that these were different from standard audio tapes in their yield strength and magnetic characteristics.

Sycor argues that, at the time of the patent application, the 3M commercial audio tape that was on the market met its specifications. If so, it is this tape (or Sycor's own specifications) that had to be disclosed to satisfy the best mode requirement of 35 U.S.C. § 112, para. 1. While Sycor's argument may be relevant to enablement, it does not establish the best mode "contemplated by the inventor," which is a subjective inquiry. *See Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 3 USPQ2d 1737 (Fed.Cir.1987); *see also Dana Corp. v. IPC Ltd. Partner-*

*ship*, 860 F.2d 415, 8 USPQ2d 1692 (Fed. Cir.1988).

The district court's determination on this point is affirmed.

## VI

### *Enablement—35 U.S.C. § 112*

Claims 1, 3, 5–7, 9–12, 14–20, 22, 29–33, 35–42, and 44 were held invalid for lack of enablement. The district court held that the patent specification did not contain an enabling disclosure of the software program used to carry out the claimed invention, stating that "the patent specification's lack of any information concerning the invention's programs would require a person reasonably skilled in the art of computer programming to experiment unduly in attempting to write programs for the '375 device."

35 U.S.C. § 112 ¶ 1 provides that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.... 

Invalidity for lack of enablement is a conclusion of law and must be supported by facts proved by clear and convincing evidence, for the grant of the patent by the PTO carries with it the presumption of validity including compliance with § 112.

A decision on the issue of enablement requires determination of whether a person skilled in the pertinent art, using the knowledge available to such a person and the disclosure in the patent document, could make and use the invention without undue experimentation. It is not fatal if some experimentation is needed, for the patent document is not intended to be a production specification. *In re Gay*, 309 F.2d 769 at 774, 135 USPQ 311 at 316, 50 CCPA 725 (1962). *See Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1576, 224 USPQ 409, 413 (Fed.Cir. 1984) (discussing the amount of experimentation).

When the challenged subject matter is a computer program that implements a claimed device or method, enablement is determined from the viewpoint of a skilled programmer using the knowledge and skill with which such a person is charged. The amount of disclosure that will enable practice of an invention that utilizes a computer program may vary according to the nature of the invention, the role of the program in carrying it out, and the complexity of the contemplated programming, all from the viewpoint of the skilled programmer. *See In re Sherwood*, 613 F.2d 809, 817, 204 USPQ 537, 544 (CCPA 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). As the court observed in *Sherwood*, the writing of a program may require varying degrees of skill:

In general, writing a computer program may be a task requiring the most sublime of the inventive faculty or it may require only the droning use of clerical skill. The difference between the two extremes lies in the creation of mathematical methodology to bridge the gap between the information one starts with ("the input") and the information that is desired ("the output").

613 F.2d at 816–17, 204 USPQ at 544.

The claimed invention of the '375 patent is not in the details of the program writing, but in the apparatus and method whose patentability is based on the claimed combination of components or steps. Further, experts for both sides testified that an experienced programmer could, without unreasonable effort, write a program to carry out the invention of the '375 patent. The possible design of superior software, or whether each programmer would work out the details in the identical way, is not relevant in determining whether the inventor has complied with the enablement requirement.

Expert witnesses testifying for Datapoint agreed that there were various ways of writing a program that would perform the '375 invention. Gordon Bell, Earle Pughe, and Fernando Corbato all testified that it would be relatively straightforward for a skilled computer programmer to de-

sign a program to carry out the claimed invention.

In Bell's deposition testimony, contrary to his testimony at trial, he averred:

Q. Would it have been obvious in June of '69 for someone of ordinary skill to write the program for a computer to operate as a source data entry terminal given the functions of the source data entry terminal?

A. Yes.

Earle Pughe testified:

Q. And could anybody have built—reasonably skilled in the art built a fixed-program read-only memory device with a source data entry program?

A. Yes, sir.

Fernando Corbato, another Datapoint expert, testified:

[T]here is a tremendous amount of lore and understanding that one must have in order to carry it out which depending on who you are dealing with may or may not be state of the art. To someone with a, a skilled computer designer, it would appear to be very, very straightforward to do anything that was described in the patent. He probably would have felt that he had already been doing that. The problem was I don't think the patent describes any novel configuration.

The district court referred in its opinion to the testimony of Kay Magleby that one skilled in the art of computer programming would be hindered because such a person could not tell where the program format would be loaded, what would be a typical program format, what characters would be used, or what would be the range or limitations of the format program. Sycor points out that the '375 patent specification states that the format program is stored in the delay line buffer memory. On cross-examination, Magleby acknowledged that the specification contains a description of how the format program is entered into the delay line buffer memory:

So here [in the '375 patent] I see a description of how, whatever this format program is, is entered into the delay line and stored on cassette tape.

In another exchange with Magleby:

Q. Would one of ordinary skill have any difficulty in determining what the instruction format would be?

A. I think one of ordinary skill could develop a product that would satisfy the claims of the patent.

However, if there's something unique about this particular product as represented in the claims, then I think it should be explained clearly enough in the specification so that we can understand what's unique.

The format program is described in the specification as "character codes which are representative of and which initiate machine control functions." Datapoint's witness Professor Clark testified that additional information such as detailed flow charts, block diagrams, or source code listings were necessary in order to avoid spending experimental time. However, as noted in *Sherwood*, a description of such information may be adequate to a skilled programmer:

In assessing any computer-related invention, it must be remembered that the programming is done in a computer language. The computer language is not a conjuration of some black art, it is simply a highly structured language.... [T]he conversion of a complete thought (as expressed in English and mathematics, i.e. the known input, the desired output, the mathematical expressions needed and the methods of using those expressions) into a language a machine understands is necessarily a mere clerical function to a skilled programmer.

613 F.2d at 817 n. 6, 204 USPQ at 544 n. 6. Although there have been circumstances wherein production of the computer program was not routine, as in *White Consol. Indus., Inc. v. Vega Servo–Control, Inc.*, 713 F.2d 788, 791, 218 USPQ 961, 963 (Fed. Cir.1983), where the production of the program required one and one half to two person-years of work, such circumstances were not shown or suggested for the '375 invention.

The great weight of the expert testimony on both sides was that a programmer of reasonable skill could write a satisfactory program with ordinary effort. This requires the conclusion that the programs here involved were, to a skilled programmer, routine. The district court's finding that undue experimentation was necessary to write the program is clear error.

The holding that the claims are invalid for lack of enablement is reversed.

## VII

### *Infringement—35 U.S.C. § 271*

Datapoint challenges the district court's finding that claims 19, 20, 25–28, 35–37, 40–42, and 44 of the '375 patent are infringed.

### *The Excluded Evidence*

■ Datapoint argues that the district court erred in finding infringement of claims 40–42 and 44, in that the court unfairly barred Datapoint from introducing evidence to rebut the testimony of Sycor's witness Dr. Larky with respect to the term "fixed program".

Datapoint states that the definition of "fixed program" was presented in the '375 patent and in pre-trial discovery as a program that was "not easily changeable" by the data entry operator, and that Larky changed the definition during his testimony to a program that was "not self-modifying and which the operator could not alter." Datapoint states that the latter definition is correct, but that this was a substantial change, and a surprise at trial. To support its position of non-infringement based on this definition, Datapoint sought to introduce, at trial, excerpts from its source codes. Datapoint states that the surprise definition of a fixed program made the source codes relevant.

Sycor objected to this proffered evidence, on the ground that the source codes were requested during discovery, were refused by Datapoint and, despite an order to compel production, were never produced. Sycor states that Datapoint did not object to Larky's testimony as surprise when it was

given, or for four months thereafter, or offer during that period to produce this previously-withheld information. Indeed, the source codes were offered into evidence on the last day of Datapoint's testimony in chief.

On this history, we conclude that the district court did not abuse its discretion in refusing to receive this evidence. *United States v. Cohen*, 888 F.2d 770, 774 (11th Cir.1989) ("Absent an abuse of discretion, evidentiary rulings of the trial court will stand.") The court's trial management "should not be impeded by second guessing at the appellate level except in those rare instances when a clear abuse of discretion is firmly shown." *Rosemount*, 727 F.2d at 1549–50, 221 USPQ at 10 (upholding exclusion of expert testimony where expert not identified before trial despite court order).

We have carefully considered Datapoint's arguments and authorities, but Datapoint has not shown that the circumstances of this case show prejudicial error, or exceeded the trial court's discretionary authority. The exclusion of the source codes is not grounds for reversal or other remedial action.

### *The Burden of Proof*

■ Datapoint argues that the district court shifted to Datapoint the burden of proving non-infringement, rather than requiring Sycor to meet its burden of proving infringement by a preponderance of evidence. Datapoint contends that it adequately showed at trial that the accused programs were self-modifying (i.e., not "fixed") in that they used "overstoring," and thus that Sycor had not met its burden of proof.

Sycor had provided evidence, through the testimony of its expert witnesses, that each element or step of the claims was embodied in Datapoint's equipment and method. The court thus directed its attention to Datapoint's defenses, stating in its opinion:

The court recognizes that Sycor has the burden of proving by a preponderance of the evidence that Datapoint has infringed the '375 patent by Datapoint's hardware-software equipment combina-

tions. Nevertheless, Datapoint has purported seriously to challenge Sycor's expert testimony in six areas. The court has therefore determined to approach the infringement issues, not from the standpoint of Sycor's affirmative assertions, but from Datapoint's defensive assertions. Except to the extent the court finds non-infringement in its findings below, the court is satisfied that, were the patent valid and enforceable, Sycor's evidence is otherwise sufficient to prove infringement by a preponderance of the evidence.

This statement does not support Datapoint's position that the district court required Datapoint to prove non-infringement by a preponderance of evidence.

In its defense Datapoint had presented evidence that there are three types of overstoring: overlays, the DOS interrupt handler, and the NOP JUMP instruction. The district court's opinion discusses the technological details, which need not be repeated here. The district court found that although the accused Datapoint devices had the capability of overstoring, Datapoint did not show that this capability was used. The court found that Datapoint had not shown that such overlays must occur in the DOS, and the court found that any possible use of overlays was not adequately explained. The court also found that Datapoint's DATASHARE interpreters use overlays, but that the evidence presented did not show sufficiently clearly that the overlays must be used. The court further found that the NOP JUMP instruction could not be used in most of the accused programs. While Datapoint contends that these findings show that the burden of proof was shifted to it, Datapoint has not shown that the trial court wavered from correct application of the burdens.

The court found in favor of Datapoint that the DATABUS 15 interpreter 32K memory device was not a fixed program, and did not infringe. Sycor does not challenge this holding. However, Datapoint makes the argument that none of its products infringe because "Datapoint users have the option to program any Datapoint DATASHARE or DATABUS system for at least part of its hardware configuration". Datapoint refers to certain pages in its user manuals, one of which describes a "default configurator" that permits the user "to configure the run-time characteristics of his DATABUS interpreter," and another of which states that it "supports many configurations ... via configuration options".

Sycor responds that the term "operational configuration" of claim 40, understood in light of the '375 patent specification, means at least the peripheral configuration of the terminal, such as input, output, and recording devices. Sycor explains that the fixed program of the '375 patent provides control for a given combination of specific peripherals, i.e., the hardware configuration, and contains the definitions of various keys, defined through the execution of the ROM program to initiate the action of the peripheral devices.

These arguments were generally before the district court. Datapoint has not met its burden of showing that the district court clearly erred in its findings. The information in Datapoint's user manuals on possible hardware or peripheral configuration at the user's option may, as Datapoint states, show that additional functions may be performed, but does not show clear error in the district court's holding that infringement of these claims was established by a preponderance of the evidence.

### Claims 35–37

While the parties dispute whether Datapoint used the phrase "reverse doctrine of equivalents" at trial, we agree with Datapoint that the substance of the argument was raised. Datapoint argued that even if these claims appear to read literally on the Datapoint equipment, the products are changed in such substantial ways from that described in the '375 patent that infringement can not be found. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123, 227 USPQ 577, 587 (Fed.Cir.1985) (*in banc*) (discussing the reverse doctrine of equivalents).

Datapoint states that its accused products are general purpose computers, rather than a special purpose terminal using a replaceable, hard-wired ROM, as contemplated in the '375 patent. Datapoint argues, as it did at trial, that its products are capable of processing data as the data are entered, and therefore that its products are not source data entry terminals. Datapoint states that its devices are so changed that, despite a literal reading of the claims on these devices, infringement is avoided under the "reverse doctrine". The district court agreed that Datapoint's products have some features in common with general purpose computers, but held that these features did not defeat infringement.

The addition of features does not avoid infringement, if all the elements of the patent claims have been adopted. *Radio Steel & Mfg. Co. v. MTD Prods.*, 731 F.2d 840, 848, 221 USPQ 657, 663–64 (Fed.Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984). Nor is infringement avoided if a claimed feature performs not only as shown in the patent, but also performs an additional function. *Id.* 731 F.2d at 848, 221 USPQ at 664. We have carefully considered Datapoint's argument that its hardware is "quite different" from that described in the '375 patent. We conclude that Datapoint has not shown clear error in the district court's finding of infringement by a preponderance of evidence.

Datapoint blames the success of Sycor's position as to infringement on the subject matter entered into the descriptive portion of the specification by the challenged Rule 312 amendment, see Part III *ante*. Sycor asserts that the district court did not adopt whatever enlarged claim interpretation Datapoint states Sycor intended to obtain through the Rule 312 amendment. Datapoint directs us to no apparent reliance by the district court on the descriptive text as modified under Rule 312.

Datapoint has shown no clear error in the district court's findings of infringement. The holding of infringement is affirmed.

## VIII

### Laches

██ Datapoint asserts that the district court erred in not finding material prejudice due to Sycor's asserted period of inaction in enforcing the '375 patent. The district court did not decide the question of laches, stating: "That the court has found for Datapoint today precludes a finding of material prejudice." Because we have reversed the majority of the rulings in favor of Datapoint, the defense of laches may require resolution. The issue is pertinent to the assessment of damages because it may affect the period of recovery for infringement. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 11 USPQ 2d 1479, 1479 (Fed.Cir.1989) (remanding for determination of laches).

The merits of the issue were not argued on this appeal, both sides agreeing that remand to the district court would be appropriate. Thus during the damages phase the court may consider the question of laches if it is duly raised.

## IX

### Other Issues

We have considered all the additional issues and arguments raised in the appeal and the cross-appeal. None changes the views expressed and decisions reached herein.

### Costs

Taxable costs shall be assessed in favor of Northern Telecom.

### Summary

Claims 19–20, 22 and 24–28 are invalid for failure to disclose the best mode. Claims 35–37, 40–42, and 44 are not invalid, are enforceable, and are infringed.

The cause is remanded for further proceedings consistent herewith.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**946**

PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.

I share the court's opinion as to Parts I through IV, and VI through IX. I respectfully dissent from the holding in Part V that certain claims are invalid for failure to comply with the "best mode" requirement of 35 U.S.C. § 112.

A holding of invalidity on this ground requires that the inventor knew of and concealed a better mode than was disclosed in the patent application. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384–85, 231 USPQ 81, 94 (Fed.Cir. 1986). It is facile, and erroneous, to infer that information not included in a patent application was necessarily concealed. Patent applications rarely contain every detail, for that is not their function, but infringers constantly seek to enlarge any omission into a fatal flaw. Challenge is easy; the penalty is extreme. Thus precedent requires that violation of the "best mode" provision be established by clear and convincing evidence. *Hybritech*, 802 F.2d at 1384, 231 USPQ at 94.

The fatal flaw with which Sycor was charged was the statement in the patent specification that standard audio tape cassettes were used to record the data, the district court holding that Sycor knew that standard audio tape was not the best mode. At the trial witnesses testified that commercial audio tape was used to record the data, that these tapes varied in quality, and that not all worked equally well. There was in evidence a document showing Sycor's specification of commercial tape parameters, including tests of tapes made by K/Tronics, TDK, 3M (Scotch brand), and ongoing tests of BASF tapes. The district court referred to Datapoint's contention that "Sycor knew at the time of filing the '375 patent application that this cassette specification was needed to practice the best mode", and held that "Sycor did not disclose the best mode". With respect to the 3M tape referred to by the panel majority, Sycor stated that the 3M tape met all of the parameters set out in its tape specification; while Datapoint argued that the 3M tape "apparently failed". The dis-

trict court did not identify the 3M tape, or any other, as the best mode.

On this record, there was not clear and convincing evidence of concealment of a better mode known to the inventor. Nor was there any finding of concealment. It was undisputed that the specification of commercial audio tape parameters was prepared by Sycor for distribution. Distribution is inimical to concealment.

To determine whether an asserted omission amounts to concealment, such omission should be considered in light of all the circumstances. For example, consideration should be given to whether the omitted information was publicly known or readily ascertainable; whether there was any benefit to the patentee of concealment—or the absence of benefit; the materiality of the information; whether the interested public was actually prejudiced; and any evidence tending to show good or bad faith. In this case, each of these factors weighs on the side of Sycor.

It was undisputed that persons of ordinary skill were aware of differences among commercial audio tapes. As was stated in *In re Karnofsky*, 390 F.2d 994, 997, 156 USPQ 682, 685, 55 CCPA 940 (1968):

Where one of ordinary skill in the art would know how to select operating conditions so as to achieve a particular result, the failure to include a recitation of some specific operating conditions in the specification cannot give rise to a rejection either under the "enabling" or under the "best mode" requirement of 35 U.S.C. § 112.

A patent document is not a "production specification". *In re Gay*, 309 F.2d 769, 772, 135 USPQ 311, 315, 50 CCPA 725 (1962); *Manual of Patent Examining Procedure* § 608.01(h) (8th ed. May 1988). It seems to me that the information on commercial audio tape parameters is not untypical of work that is done after an invention has been made, when development continues and data accumulate, often concurrently with patent application work. When the patent specification is fully enabling, the failure to include information that is not necessary either to describe or to enable

the claimed invention should not invalidate the claims under the "best mode" provision, unless the information was withheld for the purpose of concealment of a better mode.

I would reverse the trial court's holding as based on incorrect law, and the absence of clear and convincing evidence of failure to meet the "best mode" requirement.