**FREEDOM WIRELESS, INC., Plaintiff**

v.

**BOSTON COMMUNICATIONS GROUP, INC., Cingular Wireless LLC, AT & T Wireless PCS, CMT Partners and Western Wireless Corporation Defendants.**

**No. CIV.A.00–12234–EFH.**

United States District Court, D. Massachusetts.

Sept. 1, 2005.

---

**25.** See footnote number three.

LLP, Boston, Charles K. Verhoeven, Quinn Emanuel Urquhart Oliver & Hedges LLP, San Francisco, CA, Cheryl R. Brunetti, Gadsby Hannah, LLP, Boston, MA, Christopher Tayback, Diane C. Hutnyan, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, CA, Douglas C Doskocil, Goodwin Procter LLP, Boston, MA, Erica P. Taggart, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, F. Dennis Saylor, IV, Goodwin Procter, LLP, James Rehnquist, Goodwin Procter, LLP, Boston, MA, Johanna Y. Ong, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, John K. Felter, Goodwin Procter, LLP, Boston, MA, John J. Quinn, Quinn Emanuel Urquhart Oliver & Hedges LLP, Marshall M. Searcy, III, Michael T. Zeller, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, Paul F. Ware, Gadsby Hannah, LLP, Boston, MA, Robert A. Pressman, Bramson & Pressman, Conshohocken, PA, Steven D. Anderson, William C. Price, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for Freedom Wireless Inc, Plaintiff.

John Nilsson, Katherine M. Hamill, Foley Hoag LLP, Boston, MA, Kirk A. Damman, Lewis, Rice & Fingersh, LC, St. Louis, MO, Michael B. Keating, Philip C. Swain, Stephen B. Deutsch, Stephen C. Warneck, Foley Hoag LLP, Susan E. Stenger, Perkins, Smith & Cohen, LLP, Boston, MA, Todd E. Thompson, Howard Rice Nemerovski Canady Falk & Rabin, San Francisco, CA, Verne W. Vance, Jr., Vickie L. Henry, Foley Hoag LLP, Boston, MA, Adrienne L. Taclas, Bingham McCutchen LLP, Christopher B. Hockett, Bingham McCutchen LLP, East Palo Alto, CA, Denis R. Salmon, Gibson, Dunn & Crutcher LLP, Palo Alto, CA, Eric F. Pierson, Bingham McCutchen LLP, J. David Hadden, James G. Snell, Bingham McCutchen LLP, Mary T. Huser, Michael E. Woods, Patrick T. Weston, Bingham McCutchen LLP, East Palo Alto, CA, Re-

A. William Urquhart, Adrian M. Pruetz, Aimee DeSantis, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, Carolyn I. McGowan, Gadsby Hannah,

becca Hooley, Bingham McCutchen LLP, San Francisco, CA, S. Christian Platt, Bingham McCutchen LLP, East Palo Alto, CA, Victor H. Polk, Jr., Bingham McCutchen LLP, Boston, MA, Wendy L. Bjerknes, Bingham McCutchen LLP, East Palo Alto, CA, Lawrence G. Green, Perkins, Smith & Cohen, LLP, Boston, MA, Monique M. Drake, Gibson, Dunn & Crutcher LLP, Denver, CO, Douglas J. Kline, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Edward DiLello, Darby & Darby, New York, NY, Eva M. Marceau, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Frank Maldari, Darby & Darby P.C., Guy Yonay, Darby & Darby, New York, NY, Jason D. Frank, Bingham McCutchen, LLP, Joan M. Griffin, Perkins, Smith & Cohen, LLP, Karen L. Febeo, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Kevin L. Reiner, Darby & Darby, P.C., Laura Brutman, Darby & Darby, New York, NY, Paul R. Griffin, Thelen Rein & Priest LLP, San Francisco, CA, Jennifer L. Conrad, Testa, Hurwitz & Thibeault, LLP, Boston, MA, John G. Flaim, Baker & McKenzie, Dallas, TX, Tod L. Gamlen, Baker & McKenzie, Palo Alto, CA, William T. Bogaert, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Boston, MA, James Hanft, Darby & Darby, New York, NY, Nan E. Joesten, Norma G. Formanek, Farella Braun & Martel LLP, San Francisco, CA, Peter D. Baird, Lewis & Roca, Phoenix, AZ, Pierre R. Yanney, Darby & Darby, New York, NY, Richard A. Halloran, Lewis & Roca, Phoenix, AZ, Robert Laurenzi, Scott G. Lindvall, Darby & Darby, New York, NY, Douglas W. Stern, Fulbright & Jaworski, Los Angeles, CA, H. Mark Lyon, Gibson Dunn & Crutcher LLP, Palo Alto, CA, Joel S. Sanders, Gibson Dunn & Crutcher LLP, San Francisco, CA, John Carson, Fulbright & Jaworski, Los Angeles, CA, Marcus E. Cohn, Nixon Peabody, LLP, Boston, MA, Michael C. Wilson, Gibson Dunn & Crutcher LLP, Palo Alto, CA, Nicholas G. Papastavros, Nixon Peabody, LLP, Boston, MA, Robert Berliner, Fulbright & Jaworski, Los Angeles, CA, Vincent S. Walkowiak, Fulbright & Jaworski, Dallas, TX, Christopher R. Dillon, Ropes & Gray LLP, Boston, MA, Edward Han, Howrey & Simon, Washington, DC, Kristin A. Snyder, Skjerven Morrill MacPherson Franklin & Friel, San Francisco, CA, Luke T. Cadigan, U.S. Securities and Exchange Commission, Boston District Office, Mark Szpak, Ropes & Gray LLP, Boston, MA, Mark D. Wegener, Martin F. Cunniff, Howrey & Simon, Washington, DC, Peter H. Kang, Reginald D. Steer, Skjerven Morrill MacPherson Franklin & Friel, Bobby C. Lawyer, Pacific Telesis Group, Legal Department, Neil A. Smith, Limbach & Limbach L.L.P., San Francisco, CA, Stacey L. DiJon, Nixon Peabody LLP (BOS), Boston, MA, Stephen M. Everett, Limbach & Limbach L.L.P., San Francisco, CA, for Boston Communications Group, Inc., AT & T Wireless PCS, Airtouch Communications, Inc. also known as Airtouch Cellular, Alltel Communications Products, Inc., Bell Atlantic Mobile also known as Bell Atlantic Nynex Mobile also known as Banm also known as Cellco Partnerwhip, Bellsouth Cellular, Corp., Bellsouth Mobility, Inc., CMT Partners doing business as Cellular One of San Francisco, Primeco Personal Communications, L.P., Rogers Wireless, Inc also known as Rogers AT & T Wireless, Southwestern Bell Mobile Systems, Inc., Western Wireless Corporation doing business as Cellular One also known as One Cellular, Cingular Wireless LL, Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HARRINGTON, Senior District Judge.

## INTRODUCTION

In this patent infringement case, Plaintiff Freedom Wireless, Inc. ("Freedom")

alleged that Defendants Boston Communications Group, Inc. ("Boston Communications Group"), Cingular Wireless LLC, AT & T Wireless PCS, CMT Partners, and Western Wireless Corp. (collectively, the "carrier Defendants") infringed United States Patent Nos. 5,722,067 ('067 patent) and 6,157,823 ('823 patent), which relate to a prepaid cellular system.

Following a fifty-one day trial on the issues of infringement and invalidity, the jury found that Boston Communications Group and each of the carrier Defendants jointly infringed the '067 and '823 patents and returned a $128,025,000 verdict against Defendants. In addition, the jury found that Boston Communications Group willfully infringed the '067 and '823 patents.

Thereafter, Defendants tried their inequitable conduct case in an eleven-day bench trial. After considering all the evidence in the record and the arguments of counsel, the Court concludes that Defendants have not proved by clear and convincing evidence that the '067 and '823 patents were obtained by inequitable conduct. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I. THE COMINEX BROCHURE

1. Defendants allege that Freedom deceptively withheld from the Patent and Trademark Office an August 29, 1994 brochure, entitled "Making Telecommunications More Affordable," from a company called Cominex ("the Cominex brochure"). This portion of Defendants' inequitable conduct claim relates to Robert von Hellens, the then patent counsel of Freedom's predecessor, and Douglas Fougnies, a co-inventor of the patents-in-suit.

### A. Mr. von Hellens' Good Faith Decision that the Cominex Brochure Was Not Material Prior Art

#### 1. Mr. von Hellens' Decision

2. On May 8, 1996, Freedom's predecessor company, Cellexis International, took the deposition of Scott Silvey as part of a lawsuit against GTE. During the deposition, Mr. Silvey discussed the Cominex brochure.

3. On May 9, 1996, the day after Mr. Silvey's deposition, Larry Day of Cellexis faxed the Cominex brochure to Cellexis' then patent counsel, Robert von Hellens. On the fax cover sheet is a handwritten note from Mr. Day stating: "For your review per our discussion this morning. Please comment ASAP." Included in the transmission was the entire Cominex brochure as well the cover letter from Mr. Narkunski of Cominex to Mr. Silvey.

4. Mr. von Hellens remembers discussing the Cominex brochure. The copy of the brochure in Mr. von Hellens' original file includes highlighting of phrases such as "providing high risk users with a Personal Identification Number (PIN)," which he made on or about May 9, 1996.

5. After receiving the Cominex brochure, Mr. von Hellens reviewed it and came to an independent decision on its merits. Mr. von Hellens concluded that the Cominex brochure was not material prior art that had to be disclosed to the Patent Office.

6. Mr. von Hellens' conclusion was based on the following reasons: "it is inadequate to disclose, whether by itself or in combination with what was available to [Mr. von Hellens] at the time with respect to the claims." Also, it is dated less than a year before the patent application, and "under 35 U.S.C. 102, a publication to be prior art must be more than one year,

must have been available to the public more than one year prior to filing of the application."

7. Mr. von Hellens further explained that the legend at the bottom of each page of the Cominex brochure, stating "COMINEX Proprietary (RESTRICTED)—Solely for persons having a need to know pursuant to Company instructions," was "one of the things that would pop out immediately" because:

> When I see this on any document, I assume that the distribution of this document is and has been restricted until somebody tells me otherwise, which also means that it is not available to the public at large. One of the requirements for a document to be used to reject or invalidate a claim is that it in fact be available to the public. This language suggests that this document was not available to the public. Therefore, it would not be competent as a reference that the examiner would have any interest in.

8. Two sets of contemporaneous notes reflect Mr. von Hellens' evaluation. Mr. von Hellens' own handwritten note, made on May 9, 1996, states:

5/9/96

Cellexis

— T.C. w/ Day & Fougnies

— Suggested to them that Cominex disclosure is primarily a statement of desired results, rather than an enabling disclosure.

9. Moreover, Cellexis' corporate counsel, Douglas Dunipace, took notes of a conference call on May 9, 1996 with Mr. von Hellens. Other participants on the call were Cellexis' litigation counsel, Mark London and Chris Mead, Mr. von Hellens' associate, Paul Wille, and representatives from Cellexis, including Douglas Fougnies,

Larry Day, and Dan Harned. Those notes state:

5/9/96

— Robert von Hellens, Paul Wiley [sic], Chris Mead & Mark London/Fougnies, Day, Gunn, Paisley, Widner, Harned

— "Enabling disclosure"—how to make and use the invention

[-] statement of desired results—what one dreams about—

[-] does not impact of [sic] validity of patent

[-] call limits—

— no disclosure of shutting off function in real time

— no real time monitoring

[-] have already disclosed this type of information

[-] diagram from CSI doesn't show detail—absence

— distinction—no pass codes or pin codes in prior art

— what about Cominex—August 30, 1994—less than a year before filing date.

### 2. *Mr. von Hellens' Competence and Independence*

10. Mr. von Hellens has been a patent attorney for thirty-five years and has prosecuted over 1000 patent applications. Most of that time has been spent at the law firm of Cahill, Sutton & Thomas, now known as Cahill, von Hellens & Glazer, which specializes in intellectual property law.

11. Mr. von Hellens has an electrical engineering degree and worked as an engineer before becoming a lawyer. He has also served as a patent examiner in the fields of transmitters and receivers, and telephony.

12. Mr. von Hellens began working on the '067 patent application in late 1995, and

continued until Summer 1998, after the '067 patent had issued and the '823 patent application had been filed.

13. Although he was assisted by his associate, Paul Wille, Mr. von Hellens made the ultimate decision whether to submit documents to the Patent Office in connection with the '067 patent.

14. Mr. von Hellens has never had a financial stake in the issuance of the '067 patent or the outcome of this lawsuit.

15. At all relevant times, he understood that the consequences of violating his duty of candor to the Patent Office could include losing his license to practice before the Patent Office.

16. The Court found Mr. von Hellens' testimony to be extremely credible.

### 3. Submission of Other Pertinent References

17. Although Freedom (or its predecessor Cellexis) did not submit the Cominex document to the Patent Office in connection with the '067 patent, it did submit many relevant prior art references. In March 1995, it sent the Patent Office thirteen patents. One of these patents was U.S. Patent No. 5,353,335, issued to D'Urso and others, whose abstract begins: "A prepaid telephone system having multilingual capabilities is provided in a public switched telephone network." The D'Urso patent later formed the basis of an initial rejection of many claims of the '067 patent.

18. On June 11, 1996, Freedom disclosed seven additional pieces of prior art. These included three patents issued to Castro, which were filed sufficiently early to qualify as prior art.

19. One of the Castro patents, U.S. Patent No. 5,440,621, was filed on November 22, 1993, and described in its abstract: "The present invention provides a method and apparatus for prepayment of telecommunication connections.... In general, the method involves storing telecommunication time data representative of a prepurchased amount of telecommunication time available for payment of telecommunication connections in the telecommunication switching network." This patent formed the basis for a subsequent rejection of almost all then-pending claims of the '067 patent.

20. Freedom's June 11, 1996 Information Disclosure Statement (IDS) also included four journal articles that GTE's counsel had sent to Cellexis' litigation counsel with a cover letter describing the articles as "four separate learned papers about intelligent network switches and platforms." Defendants' expert, Mr. Martens, conceded that the four journal articles were, without question, prior art printed publications.

21. Freedom's June 11, 1996 IDS contained the following sentence: "It is respectfully submitted that none of this prior art discloses or suggests a transparent, secure, pre-paid cellular system as claimed by applicants."

22. Mr. von Hellens testified that the seven submitted references were prior art, whereas the Cominex brochure and CSI proposal were not. Mr. von Hellens also testified that a patent examiner reading the June 11, 1996 IDS might have erroneously concluded that Freedom had disclosed all non-material references.

### B. Mr. Mrose's Good Faith Decision that the Cominex Brochure Was Not Material Prior Art

#### 1. Mr. Mrose's Decision

23. After the '067 patent issued and while the '823 patent was pending, Freedom switched patent counsel to the law firm of Fish & Richardson.

24. In June 2000, Freedom received a notice of allowance from the Patent Office indicating that the claims in the '823 patent were allowed and would become an issued patent.

25. Shortly thereafter, Freedom received initial disclosures of prior art from the Defendants in this litigation. Those initial disclosures, served by Defendants pursuant to the rules of the Northern California District Court, where Freedom's action was pending at the time, identified hundreds of references that allegedly rendered Freedom's '067 patent anticipated or obvious.

26. In order to cite any of these hundreds of items to the Patent Office, Freedom would have had to withdraw the '823 patent from issuance so it could cite the new reference.

27. At that time, Fish & Richardson attorney Jim Mrose was the patent attorney in charge of Freedom's patent application.

28. From July through December 2000, Mr. Mrose reviewed all of the references he could find from Defendants' disclosures to determine whether Defendants' initial disclosures included material prior art that must be cited to the Patent Office. He wrote his conclusions in a formal opinion letter. Although the opinion letter was dated December 4, 2000, Mr. Mrose testified that if at any time he found material prior art, he would have immediately withdrawn the patent from issuance so he could disclose that reference.

29. One of the references Mr. Mrose reviewed in connection with this review was the Cominex brochure, which had been cited in the initial disclosures of Defendant Cellco Partners. Mr. Mrose received a copy of the Cominex brochure from litigation counsel for Freedom.

30. After reviewing it, Mr. Mrose decided that the Cominex brochure did not need to be disclosed to the Patent Office "[b]ecause the Cominex brochure is not prior art and does not suggest the existence of any prior art." A thorough explanation for Mr. Mrose's conclusion is included in his opinion letter:

Each page of this brochure, other than the cover page, is marked "COMINEX Proprietary (RESTRICTED)—Solely for persons having a need to know pursuant to Company instructions." Thus, we conclude that the Cominex brochure on its face was not a "publication" under 35 U.S.C. § 102(a). Moreover, the brochure on its face suggests that any knowledge or use of the subject matter disclosed therein was not "available to the public" and therefore cannot constitute knowledge or use of the invention within the scope of 35 U.S.C. § 102(a). *Woodland Trust v. Flowertree Nursery Inc.*, 148 F.3d 1368, 1370, 47 USPQ2d 1363, 1365 (Fed.Cir.1998). Because the date on the brochure is no more than one year before December 23, 1994, the filing date of the parent of the '199 application, the brochure on its face does not suggest the existence of prior art within the scope of 35 U.S.C. § 102(b). In addition, we conclude that the brochure on its face does not suggest the existence of prior art within the scope of 35 U.S.C. § 102(g), because the brochure does not suggest that the subject matter disclosed therein was reduced to practice. The brochure does mention that Cominex had "developed" a new platform, "which has a patent pending," but the brochure does not indicate that this platform incorporated the subject matter described elsewhere in the brochure or that the platform had actually been built. Furthermore a search for patents assigned to Cominex uncovered no issued patents, and thus we conclude

that there is no evidence of a constructive reduction to practice.

### 2. *Mr. Mrose's Competence and Independence*

31. Mr. Mrose has been practicing patent law for over fifteen years. In that time, he has specialized in patent prosecution and opinion work. He has a bachelor's degree in electrical engineering from Harvard.

32. Since graduating from law school, Mr. Mrose has worked at Fish & Richardson, a national law firm that specializes in intellectual property and high technology law.

33. Defendants' expert, Mr. Martens, testified that Fish & Richardson is an excellent patent law firm who cares very much about its reputation.

34. Each Fish & Richardson written opinion must be reviewed by a pre-selected group of opinion reviewers "to ensure the quality and the correctness of the opinions that are produced by the firm."

35. This opinion letter was reviewed and signed by Gary Walpert, a senior patent attorney who used to work at Fish & Richardson and who has a J.D. from Harvard and a Ph.D. from Massachusetts Institute of Technology.

36. Neither Fish & Richardson nor James Mrose has any financial interest in Freedom, its patents, or this lawsuit.

37. Defendants' expert, Mr. Martens, testified that the Fish & Richardson opinion letter was done in good faith.

38. The Court found Mr. Mrose's testimony to be extremely credible.

### C. *Other Evidence Regarding Materiality of Cominex Brochure*

### 1. *Confidentiality of Brochure*

39. Defendants' expert, Mr. Martens, conceded that the Cominex brochure can only be prior art if it is publicly available.

40. Here, the Cominex brochure was not publicly available. As Freedom's attorneys noted, each page of the brochure besides the cover page stated: "COMINEX Proprietary (RESTRICTED)—Solely for persons having a need to know pursuant to Company instructions."

41. GTE received the Cominex brochure directly from a Cominex representative with a personalized cover letter.

42. GTE produced the Cominex brochure to Cellexis under a confidentiality agreement.

43. Scott Silvey, a former employee of GTE, discussed the Cominex brochure during a deposition.

44. Around 1993, Cominex presented a similar brochure to Susan Mullin at Bell Atlantic Mobile, who testified (by deposition) in the jury phase of this trial that Cominex expected Bell Atlantic Mobile to keep Cominex information confidential.

45. Although Defendants introduced print-outs of unsigned letters during the jury phase of the trial that Cominex allegedly sent to many companies, these two-page letters were not the same as the Cominex brochure, did not contain the brochure's "RESTRICTED" legend, and were not at issue in the second phase of the trial. These letters were printed off a computer and unsigned. Defendants did not introduce evidence that they were actually sent.

### 2. *Lack of Technical Description*

46. The brochure states that "Cominex has developed a new platform which uses state-of-the art switching equipment and network. This platform which has a patent pending, can provide the user with both basic calling and enhanced services such as

operator services, conference calling, weather, news reports and voice and fax mail services."

47. Page seven of the brochure, entitled "The Solution," includes the statement: "Eliminate a significant portion of fraud by providing high risk users with a Personal Identification Number (PIN) and directing the usage from the customer to COMINEX."

48. Page eight of the brochure, entitled "Methodology," states: "The customer purchases prepaid GTE Mobilnet services for a minimum of $100 from GTE MOBIL-NET or one of its agents .... The GTE Mobilnet phone number then becomes the callers [sic] authorization code."

49. Page twelve of the brochure, entitled "Summary," includes the statement: "A test between GTE MOBILNET SERVICES and COMINEX can begin immediately using a modified service that employs an 800 number and authorization codes."

50. Professor Wicker testified on cross-examination that a "major" way of providing prepaid cellular phone service in the 1994 time frame required a user to purchase a card with an authorization code on it. This kind of system required the user to dial a 1–800 or other special number and then dial in the authorization code.

51. The Cominex brochure's methodology section also stated that "GTE Mobilnet Services identifies this call as a call from a pre-paid GTE Mobilnet phone and routes it directly to Cominex." There is no explanation in the brochure as to how this "identifi[cation]" might be achieved.

52. Page ten of the brochure, entitled "Technical Description," contains the statement: "The trunk connection between the GTE Mobilnet Services and Cominex is the most important issue we must resolve." Mr. Silvey testified that he does not "remember having any discussions with Mr. Narkunski about that issue that needed to be resolved." It also states: "The GTE MOBILNET SERVICES customers using this service would require a treatment that would send all calls from these phones to the COMINEX switch."

53. Although Professor Wicker opined that the phrase "GTE Mobilnet Services identifies this call as a call from a pre-paid GTE Mobilnet phone and routes it directly to Cominex" indicated that the cell phone would automatically transmit an ANI and DNIS, and that there would be a look-up of the ANI at the cellular switch, which would allow the identification of the caller, he testified on cross-examination that those features were not expressly stated in the brochure. Professor Wicker also testified on cross-examination that the "major" prepaid method in 1994, which involved dialing an authorization code after dialing a 1–800 number, would also identify the specific prepaid caller making the call. Similarly, Professor Wicker agreed that the brochure's statement that "[t]he call flow does not impact the operation of the GTE Mobilnet Services switch" was just as consistent with a chip phone or a 1–800 number, two-stage dialing system, as for a transparent system such as that of the invention of the patents-in-suit.

54. The only reference to validation of a call in the Cominex brochure states: "The Cominex switch determines the amount left in the customer's account. And if there is sufficient funds, completes the call to the destination number." There is no explanation in the brochure as to how this determination is made, and no discussion about what the account is made up of, how it is formed, or where it is stored.

55. The Cominex brochure does not show any detail about how calls would be connected.

56. The Cominex brochure does not mention or discuss periodic validation at all. The brochure states that Cominex "debits" the "customer's account" or the "appropriate usage" but does not indicate whether that process takes place during or after the call.

57. The Cominex brochure does not disclose mid-call teardown or anything about terminating calls.

58. The Cominex brochure does not describe inbound calls.

59. The Court has made no finding with respect to whether the Cominex brochure is cumulative to other references submitted by Freedom to the Patent Office.

### E. *The Silvey Deposition*

#### 1. *No Concealment of Silvey Deposition from Patent Counsel*

60. At trial, Defendants' expert Don Martens testified that Mr. Fougnies failed to discharge the duty of disclosure because Mr. Martens believed Mr. Fougnies failed to tell Mr. von Hellens information about Cominex from Mr. Silvey's deposition.

61. In his 1996 deposition, Mr. Silvey testified generally about meeting with Freedom's predecessor company, Cellexis (then known as National Communications Network, or "NCN") throughout 1994 to learn about its "method of getting after credit-challenged customers." Mr. Silvey testified that Cellexis' system had the advantage of tracking usage in real time.

62. On the topic of Cominex, Mr. Silvey testified at deposition that a company whose name he could not remember had a "product [that] was similarly configured." He initially testified that "they had the system operational in a South American market somewhere," but not in the United States. When asked about Cominex later in the deposition, Mr. Silvey remembered

the name "Cominex" and said he had spoken on the phone to someone from Cominex in 1994. At that time, the Cominex representative supposedly told Mr. Silvey that Cominex was operational "in some fashion, yes. Whether it was in test or in full development, I don't recall." Mr. Silvey went on to say that Venezuela is "the South American country that this gentleman indicated that they had fully deployed this thing," but that he "did not follow up [on] that . . . either."

63. The morning after Mr. Silvey's deposition, Freedom faxed to Mr. von Hellens documents related to the CSI reference, which is discussed below, with a note saying "Please review for an 11:00 conference call." That fax transmission included a letter from Mr. Stimson (GTE's attorney) to Mr. Mead (another Cellexis litigation attorney), which referenced Mr. Silvey's deposition. The letter begins "[a]s promised at the Silvey deposition" and later states "you may recall Mr. Silvey's testimony that termination of a call in progress . . . through the use of an intelligent device connected to a cellular switch predates your clients alleged idea by several years."

64. Later that day, a conference call took place among Cellexis' representatives, Cellexis' litigation counsel, Cellexis' corporate counsel, and Cellexis' patent counsel, including Mr. von Hellens. Although Mr. von Hellens does not remember specifics about the conference call, he remembers that they discussed Mr. Silvey to some extent.

65. At 12:44 p.m. on the afternoon of May 9, 1996, Freedom faxed the Cominex brochure to Mr. von Hellens. This fax transmission included the cover letter from Abe Narkunski to Mr. Silvey, which had Mr. Silvey's handwritten notes about Cominex's alleged operations: "Comcast

Metrophone," "Durango Unitel," "Ralph Mayfield Telops," "Vz," and "Rz digital signaling."

66. Mr. von Hellens testified that he remembered something about a system in Venezuela, information that could only have come from Mr. Fougnies.

67. On cross-examination, Defendants' expert, Mr. Martens, conceded that Mr. von Hellens' memory of a system in Venezuela would indicate that somebody told Mr. von Hellens about that information from the Silvey deposition.

68. Mr. Fougnies never had a copy of Mr. Silvey's actual deposition transcript and never submitted or caused to be submitted a copy of Mr. Silvey's deposition transcript to Mr. von Hellens.

### 2. Lack of Materiality of Mr. Silvey's Statements

69. Defendants' expert on materiality, Professor Wicker, testified that Mr. Silvey's statements were not independently material but that they cast light on the Cominex brochure, which, in his opinion, was material.

70. Professor Wicker conceded that much of Mr. Silvey's testimony was inaccurate, including Mr. Silvey's statement that Cominex had been operational in a South American country.

71. Evidence presented to the jury confirms that Mr. Silvey's statements about Cominex were untrue. Cominex never sold a prepaid system to anyone. Cominex never had trials of the prepaid system it purported to invent.

72. Moreover, Freedom had reason to know that Mr. Silvey was not testifying accurately about Cominex's operations. Mr. Silvey came to Phoenix to tour Freedom's (then Cellexis') facilities just a few weeks after he had supposedly had his phone call with Cominex. At that time,

long before the lawsuit with GTE had begun, Mr. Silvey told Freedom's inventors that they had a unique system, without mentioning Cominex.

73. One of the exhibits to Mr. Silvey's deposition was a memorandum he wrote about Cellexis on September 14, 1994, after visiting Cellexis' operations in Phoenix. In that memorandum, Mr. Silvey says "they [Cellexis] think they have hit a gold mine. (I personally agree based on my work with Pay–Go).... They clearly seem to have an edge on us in knowing how to serve this market. By using them to get at this market segment we can emulate them once we have a competitive product."

74. Although Mr. Silvey supposedly spoke with Cominex two weeks earlier, on August 30, 1994, Mr. Silvey never mentioned Cominex or its supposedly similar system in his September 1994 memorandum.

75. During his deposition, Mr. Silvey also offered his personal opinion about what the Cominex brochure conveyed. Mr. Silvey's testimony about the Cominex brochure was purely based on his interpretation of the document itself.

76. Mr. Silvey is not a person with ordinary skill in the art. Unlike Messrs. von Hellens and Mrose, Mr. Silvey does not have an engineering degree. At GTE, he worked as an account executive, market manager, and product manager in marketing headquarters.

77. Defendants' expert, Professor Wicker, conceded that Mr. Silvey's statements do not change what is in the Cominex brochure.

78. In preparation for this trial, both Mr. von Hellens and Mr. Mrose reviewed Mr. Silvey's statements about Cominex. Both testified that Mr. Silvey's deposition testimony does not change their opinion

that the Cominex brochure was not material.

79. In addition, the Court finds that Mr. Silvey's deposition testimony was not credible.

## II. *THE CSI PROPOSAL*

80. Defendants' second allegation of inequitable conduct is that Freedom deceptively withheld materials it received regarding Cellular Service Inc.'s proposal before the California Public Utilities Proceeding ("CSI proposal"). This portion of Defendants' inequitable conduct claim relates to Mr. Fougnies and Mr. von Hellens.

### A. *Mr. von Hellens' Good Faith Decision that the CSI Proposal Was Not Material Prior Art*

81. Richard Stimson, in-house counsel for GTE, attended Mr. Silvey's deposition. At the end of Mr. Silvey's deposition, Mr. Stimson mentioned a letter from CSI's counsel to the Federal Communications Commission, a diagram of CSI's proposed switch, and a transcript of part of the proceedings before the California Public Utilities Commission, and stated "that by placing these notices in this record the plaintiffs are now on notice of these two proceedings."

82. Mr. Stimson believed the CSI proposal was relevant because "CSI proposed an intelligent switch between an MTSO and the Local Exchange Network to perform functionality, including prepaid."

83. Mr. Stimson has never seen Freedom's patents and conceded that he is not in a position to determine whether the CSI or Cominex documents were material prior art.

84. On the evening of Mr. Silvey's deposition, May 8, 1996, Mr. Stimson faxed Cellexis' counsel documents related to CSI's proposal before the California Public Utilities Commission.

85. The next morning, Larry Day faxed those same documents to Freedom's patent counsel, Mr. von Hellens, in preparation for an 11:00 a.m. conference call. The fax transmission to Mr. von Hellens included Mr. Stimson's cover letter setting out Mr. Stimson's opinion that the CSI proposal demonstrated that "the methodology which incorporates an intelligent switch between a cellular MTSO and the LEC network" was not "a revolutionary technological breakthrough."

86. Mr. von Hellens reviewed the documents and came to his own opinion about whether they needed to be disclosed to the Patent Office. He determined that the CSI proposal was not material prior art because he considered it "to be in the nature of statements of desired results.... [i]n that I read this to be a document where someone was proposing that a certain system or mechanism or apparatus had various capabilities or could be provided by that piece of equipment." Mr. von Hellens further testified that "I would not consider this as prior art.... [b]ecause it doesn't have any teaching of how and why a piece of equipment works. It simply says we expect to get this kind of result." Additionally, he testified, "I did not think that those documents were documents that would be categorized as public documents or generally available to the public type of documents."

87. Two sets of contemporaneous handwritten notes reflect Mr. von Hellens' decision. Mr. von Hellens' handwritten note made on May 9, 1996 states "Cellexis conference call: Suggested that there is no teaching of decrementing billing,—primarily, a statement of desired results."

88. Additionally, Mr. Dunipace's notes, which are referred to in the Cominex section above, include a discussion of CSI.

## B. Submission of CSI Proposal to Patent Office in '823 Patent

89. In preparation for the current litigation, Mr. Fougnies, one of Freedom's inventors, came across the CSI proposal in Freedom's files.

90. Not remembering that Mr. von Hellens had already reviewed the document, Mr. Fougnies sent it to his new patent counsel at Fish & Richardson, John Phillips.

91. Unlike Mr. von Hellens, Mr. Phillips decided to send the CSI proposal documents to the Patent Office in connection with the patent application for the '823 patent.

92. On the Information Disclosure Statement, Mr. Phillips included the docket number and date for the testimony excerpts.

93. The diagram was undated. For the diagram, Mr. Phillips provided a title, but no date.

94. The '823 prosecution history indicates that the Examiner initialed both references and listed the date considered on the Information Disclosure Statement. The form explains that the Examiner should draw a line through any reference that is "not in conformance and not considered," but the Examiner did not draw a line through either of the CSI references indicating that the Examiner considered the references and believed them to be in conformance.

95. The diagram and the testimony are side by side in the '823 prosecution history. The title of the diagram is "CSI Switch to Radio–Based Cellular Carriers, LEC & IXC Interconnections." On the first page of the submitted testimony, which is the very next page of the prosecution history, the first full paragraph states: "I will discuss various features and service offerings that CSI will be able to provide if it is permitted to interconnect its own switch with the Mobile Telephone Service Offices ('MTSO's') of the radio-based cellular carriers and the Public Switched Telephone Network."

96. During the jury trial, Defendants' expert, Professor Wicker, testified on cross-examination that someone looking at the diagram and the testimony on the same day right next to each other would know that they were related.

97. Although the Examiner considered the CSI documents, he did not reject any claims based on the CSI proposal. The CSI documents are listed as references on the front of the '823 patent.

## C. Other Evidence Regarding the Immateriality of CSI Proposal

### 1. The Content of the CSI Proposal

98. The CSI proposal was not about providing prepaid services; it was about competing with the cellular carriers in providing the same kinds of services that already existed in 1991.

99. In the CSI proposal, CSI's lawyers stated that "CSI doesn't purport to offer any unique technology, nor does it expect to provide services that the carriers themselves could not also provide. Indeed, the CSI switch will use similar facilities and equipment to perform largely identical activities as the carrier switches."

100. The only reference to prepaid services in the entire voluminous CSI proposal is contained in the Widmar declaration: "From the switch-based carrier's perspective, pre-set credit limits could be established on a per-customer basis. Customers who present credit risks could be required to pre-pay for service, or could be billed on a more frequent basis."

101. Also, although the Widmar declaration, which was provided in part to Free-

dom, listed various services CSI hoped to provide if it were granted the right to compete, the declaration did not explain how any of these services would be provided.

102. One of the services CSI hoped to provide was a prepaid service. Yet, there was no flowchart or description in the Widmar declaration, or anywhere within the CSI documents, explaining how that service would be provided. At the time of the CSI proposal, there were different ways that cell phone companies were providing prepaid services, and so merely stating that they were thinking about providing prepaid services in that time frame did not mean that they were going to do it in the same way as in Freedom's invention.

103. Furthermore, nothing in the CSI proposal or the rest of the materials discloses anything about periodic validation or midcall teardown, or even mentions or describes prepaid accounts.

104. Although he had previously stated that the CSI proposal "suggested" transparency, Professor Wicker, on cross-examination, conceded that he did not know whether the CSI platform might require the separate dialing of a PIN code. The dialing of a PIN code is inconsistent with the concept of transparency. In any case, even if no PIN code were required, whatever CSI hoped to implement would not have been "transparent"—that is, having the look and feel of a regular postpaid cellular call—because the only technology it described was truly postpaid anyway.

### 2. The CSI Proposal's Lack of Materiality with Respect to Claim 15 of the '067 Patent

105. Professor Wicker testified that the CSI proposal would have affected patentability of one claim: claim 15 of the '067 patent.

#### a. Claim 35

106. As mentioned above, the CSI proposal was disclosed to the Patent Office during the prosecution of the '823 patent, and was reviewed by the Examiner with an eye toward its effect on patentability. The Examiner issued the claims of the '823 patent, including claim 35, over the CSI proposal, and did not even comment on the CSI proposal, issue any rejections based upon it, or pose any questions to the applicants about it.

#### b. Claim 15

107. Like claim 35 of the '823 patent, according to Professor Wicker, claim 15 of the '067 patent covered the first of three purported "main ideas" of the Freedom patents (which Professor Wicker designated in red). Because claim 15 and claim 35 both cover much of the same material—the identification of a caller or called party as prepaid and the forwarding of the calling party and destination's identifier to the prepaid service provider—the CSI proposal that was regarded as immaterial to the issuance of claim 35 would have also been immaterial to the issuance of claim 15, had it been before the Examiner during the '067 patent prosecution.

108. Also, Professor Wicker admitted on the stand—after agreeing that claim 15 was about identifying the subscriber as prepaid—that what CSI was proposing to do would not have identified callers as prepaid at all, but would have sent to CSI all of the CSI subscribers, both prepaid and postpaid.

109. The Court has made no finding with respect to whether CSI is cumulative to other references submitted by Freedom to the Patent Office.

### III. THE KLEPP ARTICLE

110. Defendants' third allegation of inequitable conduct is that Freedom decep-

tively withheld an article published in *Telephony* magazine, entitled "Managing the Revenue Stream," by David E. Klepp ("the Klepp article") during prosecution of the '823 patent. This portion of Defendants' inequitable conduct claim relates only to Dan Harned, a co-inventor of the patents-in-suit.

### A. *Mr. Mrose's Good Faith Decision that the Klepp Article Was Not Material Prior Art*

111. One of the documents that Defendants identified in their initial disclosures of prior art in this litigation was the Klepp article.

112. Immediately after receiving Defendants' initial disclosures, Freedom's president, Larry Day, contacted *Telephony* magazine and ordered a copy of the article. On July 12, 2000, Mr. Day faxed the Klepp article to his patent counsel at Fish & Richardson, Mr. Mrose.

113. Mr. Mrose understood that Freedom wanted his independent opinion about whether it should disclose the Klepp article to the Patent Office. Mr. Mrose analyzed the Klepp article and determined that it was not material prior art, and so did not need to be submitted to the Patent Office.

114. Mr. Mrose concluded that the Klepp article did not need to be disclosed because "the Klepp article is cumulative, and actually less than cumulative, with respect to Banana Cellular [Wise patent] . . . and there were multiple reasons why it was less than cumulative. And then, also, furthermore, it did not establish a *prima facie* case of obviousness or anticipation of any claim."

115. Fish & Richardson's formal opinion letter provides a detailed three-page explanation of Mr. Mrose's basis for his

conclusion that the Klepp article was not material, which includes the following:

> The Klepp article . . . is less than cumulative with respect to the Banana Cellular [Wise] patent. In particular, the Klepp article, which describes a land-based long-distance telephone system rather than a wireless system as in the Banana Cellular patent and the claims of the '199 application, also fails to describe or suggest any of the key Features A through F that formed the basis for allowability of the claims of the '199 application over the Banana Cellular patent. . . . Note that page 33 of the Klepp article states that "tight integration of voice processing, which allows callers to interact with RTBSs" has been utilized by "international calling, cellular, debit card and credit card providers. . . ." Because this statement refers to tight integration of voice processing with real-time billing systems generally, and not more specifically to the real-time billing system described in the Klepp article, it in no way suggests that the specific real-time billing system described in the Klepp article should be incorporated into a cellular system. Rather, this statement is simply a statement of fact describing the pre-existing utilization of real-time billing systems.

### B. *Footnote Regarding Feature Group D*

116. As part of its discussion of the Klepp article, the opinion letter analyzed whether the Klepp article disclosed any of the limitations that the Examiner used to distinguish the claims in the '823 patent application over the Wise patent.

117. At the end of the discussion why "the Klepp article fails to disclose (D) the switching system sending an account identifier and a destination identifier to the real-time billing system or the long-dis-

tance carrier," Mr. Mrose wrote, "[l]ike-wise, there is nothing to suggest that the switching system sends any sort of account identifier to the RTBS." In support of this last statement, Mr. Mrose included a footnote discussing the article's reference to Feature Group D.

118. That footnote states, in part:

It is our understanding, based on information provided to Mr. James E. Mrose of Fish & Richardson P.C. by Mr. Dan Harned of Freedom Wireless, that the most common usage of Feature Group D circuits is for providing equal access for long-distance calling.... Because page 33 [of the Klepp article] refers to use of Feature Group D for "high-cost (long distance)" calls, the Klepp article contemplates using a Feature Group D circuit for this same purpose of providing equal access, long-distance calling.

119. Neither Mr. Harned nor Mr. Mrose remember whether Mr. Harned told Mr. Mrose that Cellexis' implementation of the patented system used Feature Group D to process its local calls, as well as its long distance calls.

120. Nevertheless, Mr. Mrose testified that this fact would be consistent with his opinion about the Klepp article.

121. Defendants' expert, Mr. Martens, conceded that there could not be a breach of a duty to disclose if Fish & Richardson had independent reasons not to disclose the Klepp article, separate from the information from Mr. Harned.

122. In fact, Mr. Mrose's opinion letter provides independent reasons, including that the Klepp article was cumulative of the Wise patent, which was already before the Examiner, and that the Klepp article did not make a *prima facie* case of unpatentability. After discussing his analysis why the Klepp article was cumulative of

the Wise patent, Mr. Mrose testified as follows:

Q. Now, if you had stopped your analysis at that point, would your conclusion had been the same, that Klepp didn't need to be disclosed?

A. Yes, the analysis could have stopped here and the opinion would be complete.

Q. You didn't stop there, though. Did you?

A. That's correct, because there are multiple reasons why Klepp is not material.

123. None of the expert reports of Mr. Martens offered the opinion that Mr. Harned's discussions with Mr. Mrose were inequitable conduct.

C. *Additional Evidence Regarding Lack of Materiality of Klepp Article*

124. The Klepp article discusses the routing of a landline, long-distance call. The process described in the diagram is purely landline. The author was addressing issues specific to the relatively expensive long-distance landline calls.

125. The only mention or indication of anything cellular in the entire Klepp article is on the second page: "This explains why international-calling, cellular, debit card and credit card providers have been among the first to integrate that technology." There is no mention of a cellular phone, a MTSO (cellular switch), or of how a cellular switch works.

126. The statement about real-time billing systems being used in cellular systems referred to things that were already in existence, already out in the marketplace, in November 1993. At that time, there were hotlining systems that were not transparent and required special dialing but which used real-time billing systems as described in the Klepp article.

127. The Klepp article does not include the identification of an ANI; the phones do not send identifiers and, instead, callers are identified by the wires coming from their landline phones. The LEC associates the phone number with the wires so that it can determine which landline long-distance company that caller belongs to. This process has been in existence since 1983 or 1985.

128. Furthermore, in the Klepp article there is no identification of a call as prepaid; all calls are connected to the proper long-distance provider. The ANI is sent to the real-time billing system so the long-distance network knows who to bill the call to.

129. What is described in the Klepp article does not include the sending of the ANI. Only the destination number is sent to the LEC. The sending of the ANI and DNIS over a Feature Group D circuit was disclosed in the Popke, Fodale and Margulies references and by 2000, it was already the subject of a well-known standard. Professor Wicker agreed that the Popke reference and the Fodale reference each explained how an ANI is transmitted in a private Feature Group D circuit more explicitly than the Klepp article.

130. Professor Wicker testified that the Klepp article does not describe periodic validation.

131. Rather than a system with mid-call teardown, the Klepp article seems to discuss metered billing. The article discussed real-time billing systems that existed at the time, and at that time there were systems that cut off the call after the call was already over. This kind of system is described in the Freese '543 patent, which was before the Examiner on the prosecution of the '067 and '823 patent applications and which was actively discussed by the Examiner and applicants' counsel during the prosecution of the '067 patent.

132. The portions of the Klepp article that Professor Wicker testified show mid-call teardown are: "... and a prepaid debit account curtails services at a specified amount" and "the RTBS limits the amount of services offered and politely informs the caller when the limit has been reached." The fact that there were systems in existence that did not cut off at midcall but merely politely informed people that a limit had just gone by suggests that if one sought to describe mid-call teardown, they would be specific in doing so. Also, the illustration of bills on the front page of the article, and discussion about reducing "the float of receivables and bill shock" is inconsistent with the concept of mid-call teardown, which would completely eliminate bills, receivables and float.

133. Freedom's patents eliminate the need for bills, the occurrence of float, and receivables. Professor Wicker even conceded that receivables discussed in the Klepp article had "no application to Freedom Wireless' patents." Instead of "prepaid technology," the article seems to describe reducing delay in the processing of bills by using "real-time" technology.

## D. Additional Evidence Regarding Cumulativeness of Klepp Article

134. Professor Wicker testified that if the Examiner had the Wise 5,826,185 patent, the Klotz 5,592,535 patent, and the CSI proposal before him, he would have all three purported main ideas in the Freedom patents plus periodic validation.

135. The Wise 5,826,185 patent, the Klotz 5,592,535 patent, and the CSI excerpts were all in fact before the Examiner during the prosecution of the '823 patent, when the Klepp article was first received by the applicants to the '823 application.

136. Professor Wicker testified that the Klepp article would have affected patentability of claim 35 of the '823 patent. On cross-examination, he conceded that Klepp was cumulative in light of the CSI proposal with respect to claim 35.

137. After this concession, Professor Wicker came back the following day and testified that claim 26 would have been "not novel or obvious" had the Klepp article been disclosed to the Patent Office. This claim was never asserted in the litigation; thus, no testimony was presented about it in the first phase of the trial. Professor Wicker admitted that he did not describe his analysis with respect to claim 26, and that counsel had not even asked him about it.

138. Claim 26 is an inbound claim. Professor Wicker has conceded that the Klepp article says "nothing whatsoever" about incoming calls.

## IV. THE WISE PATENT APPLICATION AND SYSTEM

139. Defendants' fourth allegation of inequitable conduct is that Freedom deceptively withheld the patent application that became U.S. Patent No. 5,826,185 invented by Andrew Wise and Ted Rich and assigned to Banana Cellular Inc. ("the Wise patent application"), as well as information about Mr. Fougnies' visit to Banana Cellular's store. This portion of Defendants' inequitable conduct claim relates only to Mr. Fougnies.

### A. Submission of the Wise Patent to the Examiner During the '823 Patent

140. Freedom disclosed the issued Wise patent to the Patent Office on February 3, 1999, while the '823 patent was pending.

141. The Examiner subsequently rejected 16 claims on the basis of the Wise patent.

142. The rejection was based on the way that certain claims in the '823 patent application were drafted. In particular, some of the claims in the '823 patent application left out the step that the switch would look up the ANI. Once this element was clarified, so that the claims included the switch recognizing the ANI, those claims were allowed over the Wise patent.

143. This drafting issue was unique to claims in the '823 patent application and would not have affected the claims of the '067 patent.

### B. Evidence Regarding Wise Patent Application

144. Although Freedom disclosed the Wise patent to the Patent Office, it did not disclose its copy of the Wise patent application.

145. Mr. Fougnies, one of Freedom's inventors, received the application in 1998 from Mr. Rich, a co-inventor of the Wise patent, after Mr. Fougnies read a press release mentioning that the Wise patent had been allowed.

146. The correspondence with the Patent Office in that patent application ended in 1997 because that was when Mr. Rich had a falling out with Mr. Wise and stopped receiving updates related to the application.

147. Mr. Fougnies knew that the Examiner Maung listed on the Wise and Rich patent application was the same Examiner who worked on Mr. Fougnies' own application.

### C. Additional Evidence Regarding Examiner's Awareness of Wise Patent Application

148. By the time Examiner Nay Maung took his first documented action on

the prosecution of the '067 patent application, on October 10, 1996, he had already been working on the first application for the Wise patent for at least one year. His notations in the Wise prosecution history show that he was very familiar with the Wise application by October 10, 1996. He had:

- conducted a prior art search and talked to Examiner Oehling about the Wise application on October 10, 1995;
- conducted another prior art search and applications search on October 11, 1995;
- issued an Action on October 25, 1995;
- conducted another prior art search, talked to Examiner Oehling, and conducted an applications search on April 15, 1996;
- issued an Office Action on April 17, 1996;
- responded to a revocation of power of attorney on July 9, 1996; and
- issued an Advisory Action on August 1, 1996.

149. That particular Wise application was abandoned shortly thereafter, but was rolled over into (and thus contained the same matter as) the continuation application that eventually resulted in the Wise '185 patent. This Wise continuation application was still pending, and Mr. Maung was still actively working on it, the whole time he worked on the '067 patent application.

150. Professor Wicker opined that the Wise application would have been material to one claim—claim 15 of the '067 patent. Upon cross-examination, Professor Wicker conceded that, of the three "basic ideas" that he opined were set forth in the '067 patent, claim 15 set forth the first "idea" of identifying calls as prepaid and routing them to the service provider. Professor Wicker previously conceded that transpar-ency—that is, identifying calls as prepaid and routing them to the service provider—was *not* part of the Wise patent.

### D. *Additional Evidence of Cumulativeness of the Wise Patent Application*

151. Professor Wicker analyzed the Wise patent and testified before the jury that it contained the second and third basic ideas of Freedom's patents—that is, "use host computer to receive identifier, validate balance and connect call" and "terminate call if balance exhausted"—but not the first, "identify a call as prepaid and route it to a prepaid service provider." He also testified that Wise disclosed periodic validation and that the Examiner on the '823 patent would have known of periodic validation from the Wise patent.

152. The Klotz 5,592,535 reference was before the Patent Examiner during the prosecution of the '067 and '823 patents and was reviewed by the Examiner. Like the Wise reference, Professor Wicker stated that the Klotz reference disclosed both the second and third "basic ideas" in the Freedom patents. Also, like the Wise reference, Professor Wicker testified that the Klotz reference disclosed periodic validation and that the Examiner of the '823 patent application would have known about periodic validation from the Klotz patent.

153. Professor Wicker admitted that same elements that were disclosed by the Wise reference were disclosed by the Klotz reference.

154. Professor Wicker also admitted that the Klotz patent was a transparent, secure prepaid cellular system, while the Wise patent was neither transparent nor secure.

### E. *Evidence Regarding the Wise System*

155. In December 1993, Mr. Fougnies visited the Banana Cellular store, which

was run by the inventors of the Wise patent. While there, Mr. Fougnies participated in a demonstration in which he called his office.

156. Mr. Fougnies did not know how Banana Cellular's system operated. After the demonstration, Mr. Fougnies called his co-inventor, Mr. Harned, but Mr. Harned did not know how Banana Cellular's system operated. Mr. Fougnies then discussed the demonstration with an engineer at Bell Atlantic Mobile, Joe Fite, who guessed that Banana Cellular might be use a hotlining system. But even after talking with Mr. Fite, Mr. Fougnies still did not know how the Banana Cellular system worked; he just had a guess that the "hotlining" method could be involved.

157. Defendants' initial disclosures of prior art in this case listed a "Prepaid cellular telephony system offered for sale prior to December 1, 1993." According to the Fish & Richardson opinion letter, Mr. Mrose discussed this item with Mr. Fougnies, who "informed Mr. James Mrose of Fish & Richardson P.C. that he has no information concerning the purported offer for sale, and no reason to believe that the purported offer for sale pertained to subject matter other than that disclosed by Wise U.S. Patent No. 5,826,185 . . ., which was disclosed to the patent Examiner in the '199 application."

158. Mr. Mrose determined that "we have no reason to believe that the purported offer for sale was more than cumulative with respect to the Banana Cellular patent, and thus there is no need under 37 C.F.R. § 1.56 to disclose this information in the '199 application."

159. Freedom had already disclosed the issued Wise patent to the Examiner in the '823 patent. According to one of the inventors of the Wise patent, Theodore Rich, the system Banana Cellular was us-

ing in 1993 was the same as what is described in the Wise patent.

160. Although Mr. Mrose does not specifically remember discussing Banana Cellular with Mr. Fougnies, Mr. Mrose believes that Mr. Fougnies must have at least told him that the purported offer for sale might be the same thing as the Wise patent.

## CONCLUSIONS OF LAW

### I. *STANDARDS FOR INEQUITABLE CONDUCT*

■ 161. "To establish unenforceability based on inequitable conduct the challenger must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of misleading or deceiving the patent examiner." *Allied Colloids, Inc. v. Am. Cyanamid Co.,* 64 F.3d 1570, 1578 (Fed.Cir.1995).

■ 162. "Inequitable conduct entails a two-step analysis: first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all of the circumstances to determine whether the applicant's conduct is so culpable that the patent should be unenforceable." *Juicy Whip, Inc. v. Orange Bang, Inc.,* 292 F.3d 728, 744 (Fed.Cir.2002).

163. In step one, the Court must first determine whether Defendants have proven a threshold level of both materiality and intent. *Board of Educ. ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.,* 333 F.3d 1330, 1343 (Fed.Cir.2003) ("First, the trial court must determine whether the conduct meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO."); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1584

(Fed.Cir.1996) ("One alleging inequitable conduct must prove the threshold elements of materiality and intent by clear and convincing evidence.").

164. "If, however, either the threshold level materiality or intent is not found, then no further analysis need be performed and unenforceability must be denied." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1261 (Fed.Cir. 2001).

165. Only if the threshold levels of materiality and intent have been established must the trial court weigh them. "In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Am. Bioscience*, 333 F.3d at 1343.

166. "[A] party seeking to have a patent declared unenforceable has a heavy burden to meet. Inequitable conduct requires misrepresentation or omission of a material fact, together with an intent to deceive the PTO. Both of those distinct elements must be shown by clear and convincing evidence." *Hoffmann–La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed.Cir.2003); *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed.Cir.2001) ("The two essential elements of inequitable conduct—materiality and intent to deceive—must both be proven by clear and convincing evidence.").

167. "Both intent and materiality are questions of fact that must be proven by clear and convincing evidence." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed.Cir.2003); *Juicy Whip*, 292 F.3d at 744 (Fed.Cir.2002) ("Both intent and materiality are questions of fact.").

168. During trial, the Court found the testimony of Mr. von Hellens and Mr. Mrose to be extremely credible.[1]

 169. Defendants failed to prove by clear and convincing evidence that Freedom's patents should be declared unenforceable due to inequitable conduct.

## II. MATERIALITY

### A. Standard for Materiality

170. The standard for materiality is set out in 37 C.F.R. § 1.56. *Am. Bioscience*, 333 F.3d at 1343 n. 8 (applying this rule in determining that reference was not material, and stating, "[t]he duty to disclose information material to patentability is set forth in PTO Rule 56").

171. Section 1.56 was amended in 1992 to define "materiality" as follows:

b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

*Dayco Prods.*, 329 F.3d at 1363–64 ("In 1992, however, the Patent Office amended its rules to provide a different standard for materiality.... The new rule

---

1. Conversely, the Court did not find credible the opinions of Professor Wicker. Indeed, Professor Wicker was the Defendants' main expert on infringement and invalidity during the jury trial, and the jury, in reaching its verdict, disregarded his testimony.

reiterated the preexisting duty of candor and good faith, but more narrowly defined materiality, providing for disclosure where the information establishes either a prima facie case of unpatentability or refutes, or is inconsistent with a position the applicant takes.") (internal quotations omitted).

172. "There is no duty to submit information which is not material to patentability of any existing claim." 37 C.F.R. § 1.56(a); M.P.E.P. § 2001.05 ("Under the rule, information is not material unless it comes within the definition of 37 C.F.R. § 1.56(b)(1) or (2). If information is not material, there is not duty to disclose the information to the Office.").

■ 173. "An applicant can not be held to have acted inequitably for not providing the examiner with information that was not material." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1115–16 (Fed.Cir.1996) (holding that there was no inequitable conduct because undisclosed "prior art information" was not material prior art, stating defendant's "patent expert testified that Mr. Hebert had the obligation to submit the [defendant's] 'prior art information' to the examiner, and that his failure to do so was inequitable conduct under the law. That was an incorrect statement of the law").

### B. *Cumulativeness*

■ 174. "[A]n applicant need not disclose a material reference if it is cumulative to or less material than those already before the examiner." *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1360 (Fed.Cir.2001); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed.Cir.2001) (holding there was no inequitable conduct because "[t]hese disclosures are not material if they are merely cumulative of references that were already before the examiner. We agree with Mentor that the record

indicates that the references were merely cumulative of the prior art on ultrasonic devices that fragment tissue").

175. Because the Court did not make a finding with respect to the cumulativeness of the Cominex brochure, the Court makes no ruling thereon.

176. Because the Court did not make a finding with respect to the cumulativeness of the CSI proposal, the Court makes no ruling thereon.

177. Defendants have failed to prove by clear and convincing evidence that the Klepp article was not cumulative to other references in the '067 and '823 patents.

178. Defendants have failed to prove by clear and convincing evidence that the Wise patent application or information about Mr. Fougnies' visit to Banana Cellular was not cumulative to other references in the '067 and '823 patents.

### C. *Specific Requirements for Materiality*

### 1. *To Be Material, Information Must Be Accurate*

179. There is no obligation to submit potentially material information that is not, in fact, material. *See Ultradent Prods., Inc. v. Life–Like Cosmetics, Inc.*, 127 F.3d 1065, 1072 (Fed.Cir.1997) (holding no inequitable conduct not to disclose handwritten notes of a potential test because test never actually took place, stating "[i]f the composition was never made, it could not have been material to patentability because it was nothing more than a handwritten formulation that neither supported nor contradicted the statements made during prosecution"); *Am. Bioscience*, 333 F.3d at 1344 (reversing district court and holding that there was no inequitable conduct because "[t]he district court's conclusion of inequitable conduct was based on its find-

ing that Soon–Shiong and Desai failed to disclose to their attorney that Tao formerly worked at FSU. Since we have concluded that the FSU scientists were not inventors, Tao's having worked at FSU was not material to any issue of patentability in this case"); *Allied Colloids,* 64 F.3d at 1578 ("In view of our holding that a public use bar is not supportable on the evidence that was adduced, the failure to tell the examiner about this purported bar can not be deemed material and culpable ...").

■ 180. There is no obligation to allow the examiner to make the decision that immaterial information is not material. *See Hupp v. Siroflex of Am., Inc.,* 122 F.3d 1456, 1466 (Fed.Cir.1997) ("Siroflex told the jury that even if the submission were not an on-sale event, it should have been presented to the patent examiner so that the examiner could decide whether it was. There is no obligation to present the examiner with information that is not material to patentability, on pain of loss of patent rights based on inequitable conduct.").

181. Freedom had no obligation to submit to the Patent Office Mr. Silvey's inaccurate and immaterial statements about Cominex's alleged operations. As Professor Wicker conceded, Mr. Silvey's statements about Cominex were inaccurate, and thus not helpful in determining whether Cominex had a prepaid system or in understanding the Cominex brochure.

## 2. *Material Information Must Be Definite Enough to Support a Patentability Rejection*

■ 182. Information that cannot support a patentability rejection is not material. *Life Techs., Inc. v. Clontech Labs., Inc.,* 224 F.3d 1320, 1326–27 (Fed.Cir.2000) (finding no inequitable conduct for failing to disclose allegations of "similar results" because "the inventors could not have revealed anything to the Examiner regard-

ing this presentation beyond conjecture and a vague report that 'similar results' were presented. Such incomplete information would be singularly unhelpful to the Examiner in determining whether the invention was patentable, and consequently, would not be material").

183. "An applicant can not be held to have acted inequitably for not providing the examiner with information that was not material ..." *Hebert,* 99 F.3d at 1115–16 (holding that there was no inequitable conduct because undisclosed "prior art information" was not material prior art, stating defendant's "patent expert testified that Mr. Hebert had the obligation to submit the [defendant's] 'prior art information' to the examiner, and that his failure to do so was inequitable conduct under the law. That was an incorrect statement of the law").

■ 184. "The mere possibility that material information may exist will not suffice to give rise to a duty to inquire .... [A]s a general rule, there is no duty to conduct a prior art search, and thus there is no duty to disclose art of which an applicant could have been aware." *Frazier v. Roessel Cine Photo Tech, Inc.,* 417 F.3d 1230, 1238 (Fed.Cir.2005) (internal quotations omitted).

185. Freedom had no obligation to submit to the Patent Office Mr. Silvey's statements that Cominex may have been operational in some form or that Cominex had a system "similar" to Cellexis' because these vague, incomplete, and ultimately inaccurate statements would not have been helpful to the examiner.

186. Freedom had no obligation to submit to the Patent Office information about Mr. Fougnies' participation in a demonstration at Banana Cellular. There was no evidence that the inventors knew how the Banana Cellular system worked other than

88

their own speculation, or that they knew during the '067 prosecution that Wise had applied for a patent on the system.

### 3. For Anticipation and Obviousness, Only Prior Art Is Material

■ 187. Defendants contend that the references were material for anticipation and obviousness, under sections 35 U.S.C. §§ 102 and 103. For anticipation and obviousness, only information that qualifies as prior art can be material.

188. "[I]t is prior art that must be disclosed, prior art that is material to patentability." *Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1315 (Fed.Cir.2000) (holding that inventors' "entire personal knowledge in the field of the invention" was not material); *Hebert*, 99 F.3d at 1115 (holding that letters sent to inventor reflecting that others had invented the same technology were not prior art and were therefore immaterial); *Hupp*, 122 F.3d at 1466 (holding that information that did not amount to an offer for sale was immaterial); *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 940 (Fed.Cir.1990) (affirming no inequitable conduct because "[t]he district court found that the Viatron 21 device was not available as prior art. Datapoint does not on appeal challenge that finding, but merely calls the Viatron 21 'prior art' in arguing that it should have been disclosed. Since the Viatron 21 device was not prior art, it was not material to patentability"); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed.Cir. 1983) ("There was no duty, however, to bring to the attention of the PTO the Risenfeld disclosure because it was a mere 'conception' and was admittedly not prior art.").

189. It is the reference itself, not related information, which is material. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed.Cir.1998) ("Although international al search reports may contain information material to patentability if they contain closer prior art than that which was before the United States examiner, it is the reference itself, not the information generated in prosecuting foreign counterparts, that is material to prosecution in the United States.").

190. Freedom had no obligation to submit the Cominex brochure, information from Mr. Silvey, and information about Mr. Fougnies' visit to Banana Cellular because they were not prior art.

191. Defendants have failed to prove by clear and convincing evidence that the Cominex brochure was material to the '067 or '823 patents.

192. Defendants have failed to prove by clear and convincing evidence that the CSI proposal was material to the '067 patent.

193. Defendants have failed to prove by clear and convincing evidence that the Klepp article was material to the '823 patent.

194. Defendants have failed to prove by clear and convincing evidence that the Wise patent application or information about Mr. Fougnies' visit to Banana Cellular was material to the '067 patent.

### 4. To Serve as a Prior Art Printed Publication, the Document Must Be Publicly Available

195. Prior art under § 102(a), (b) and (g) must be public. *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir.1997) ("Subsections (a), (b), (e), and (g), on the other hand, are clearly prior art provisions. They relate to knowledge manifested by acts that are essentially public. Subsections (a) and (b) relate to public knowledge or use, or prior patents and printed publications ..."). The Federal Circuit has explained:

It has been a basic principle of patent law, subject to minor exceptions, that prior art is technology already available to the public. It is available, in legal theory at least, when it is described in the world's accessible literature, including patents, or has been publicly known or in . . . public use or on sale "in this country." That is the real meaning of "prior art" in legal theory—it is knowledge that is available, including what would be obvious from it, at a given time, to a person of ordinary skill in the art.

*Id.*

196. A document, to serve as a "printed publication," must be generally available. *N. Telecom, Inc.*, 908 F.2d at 936–37. A restrictive legend on the document is probative evidence that it is not publicly available. *Id.* (holding that documents were not printed publications because they were likely distributed with the legend "Reproduction or further dissemination is not authorized . . . not for public release"); *Allied Tube & Conduit Corp. v. John Maneely Co.*, 125 F.Supp.2d 987, 990 (D.Ariz.2000) (holding that letters were not "printed publications" because they were only sent to 20–30 distributors and were stamped "confidential").

197. If information is not publicly accessible, it is not prior art under 35 U.S.C. § 102(a). *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir.1998) ("[I]n order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public."); *Levi Strauss & Co. v. Golden Trade, S.r.L.*, 1995 WL 710822, at *18 (S.D.N.Y.1995) ("Under section 102(a), however, the prior inventor must have taken no affirmative steps to keep the prior invention secret."); *Globe Linings, Inc. v. Firestone Tire & Rubber Co.*, 555 F.2d 727, 729 (9th Cir.1977) (holding that Army

report "cannot be considered as prior art because it was not public information as required by 35 U.S.C. § 102(a). Although § 102(a) merely defines prior art as an 'invention . . . known or used by others,' this provision has been held to mean 'only what was known or used publicly or was accessible to the public' ") (internal citations omitted).

198. "For prior art to anticipate under 35 U.S.C. § 102(a) because it is 'known,' the knowledge must be publicly accessible, and it must be sufficient to enable one with ordinary skill in the art to practice the invention." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir.2002) (internal citations omitted).

199. "Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed.Cir.2004) (internal citations omitted).

200. The Cominex brochure was not material prior art because it was not publicly available.

### 5. *Anticipatory Prior Art Under 35 U.S.C. § 102(a) Must Also Be Enabling*

201. 35 U.S.C. § 102(a) provides that a person is not entitled to a patent if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a).

202. "To serve as an anticipating reference, the reference must enable that which it is asserted to anticipate. A claimed invention cannot be anticipated

by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Elan Pharm., Inc. v. Mayo Found. for Med. Educ. & Research,* 346 F.3d 1051, 1054 (Fed.Cir.2003) (internal quotations omitted); *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1354 (Fed.Cir.2003) ("Long ago our predecessor court recognized that a non-enabled disclosure cannot be anticipatory (because it is not truly prior art) if that disclosure fails to enable one of skill in the art to reduce the disclosed invention to practice.") (internal quotations omitted); *PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1566 (Fed.Cir.1996) ("To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter.").

203. The Cominex brochure and CSI proposal were not material prior art under 35 U.S.C. § 102(a) because they were not enabling.

### 6. *Anticipatory Prior Art Under 35 U.S.C. § 102(b) Must Also Be Dated More Than a Year Before Patent Application Was Filed*

204. 35 U.S.C. § 102(b) provides that "[a] person shall be entitled to a patent unless … the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

205. According to the Federal Circuit, "[i]n order to invalidate a patent under the on-sale bar of 35 U.S.C. § 102(b), an accused infringer must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the patent and that the product

sold or offered for sale anticipated the claimed invention or rendered it obvious." *Minn. Mining & Mfg.,* 303 F.3d at 1301; *Rapoport v. Dement,* 254 F.3d 1053, 1056 (Fed.Cir.2001) ("We note that the FPR Publication does not constitute a statutory bar against either Dement et al. or Rapoport, since it was published less than one year before the priority filing date of the '325 and '693 applications.").

206. The Cominex brochure was not material prior art under 35 U.S.C. § 102(b) because it was dated less than a year before the application date of the '067 patent.

### 7. *Anticipatory Prior Art Under 35 U.S.C. § 102(g) Must Also Be Reduced to Practice in the United States*

207. Under 35 U.S.C. § 102(g), a person is not entitled to a patent if "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g).

208. For an invention to be considered "made in this country" under § 102(g), the invention must have been reduced to practice in the United States. *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1189 (Fed.Cir.2002) ("An inventor can establish that she was the first to invent under § 102(g) by demonstrating either that she was the first to reduce the invention to practice or that she was the first to conceive of the invention and then, prior to the other party's conception, exercised reasonable diligence in reducing the invention to practice."); *Slip Track Sys., Inc. v. Metal–Lite, Inc.,* 304 F.3d 1256, 1265 (Fed. Cir.2002) ("In order to establish actual reduction to practice, the inventor must

prove that he constructed an embodiment or performed a process that met all the limitations of the claim, and that he determined that the invention would work for its intended purpose.").

209. Mr. Silvey's information about Cominex's alleged operations in South America could not have been referring to prior art because those alleged operations were outside the United States. Moreover, Cominex never tested a true prepaid wireless system in the United States (or anywhere).

### 8. *Documents Relevant to Obviousness Must Still Be Prior Art*

210. 35 U.S.C. § 103 states: "A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

211. "Obviousness hinges on four factual findings: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed.Cir. 2004).

212. Only prior art can render a patent obvious. *Biacore v. Thermo Bioanalysis Corp.*, 79 F.Supp.2d 422, 462 (D.Del. 1999) (holding patent was not invalid for obviousness and stating "[a] threshold question [in determining obviousness] is whether any or all of the publications identified by Thermo should be characterized as 'prior art' ").

213. The Cominex brochure was not material to obviousness because it was not prior art.

## III. *INTENT TO DECEIVE*

### A. *Requirements for Intent to Deceive*

214. "Conduct that requires forfeiture of all patent rights must be deliberate ..." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1573 (Fed.Cir.1991). "[A] finding of deceptive intent cannot be based on mere inference or even on gross negligence; there must be conduct, viewed in light of all the evidence, including evidence indicative of good faith, that must indicate sufficient culpability to require a finding of intent to deceive." *Hebert*, 99 F.3d at 1116. "[A] mere showing that references having some degree of materiality were not disclosed does not establish inequitable conduct." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1442 (Fed. Cir.1991).

215. Whether an intent to deceive exists must be determined "in light of the realities of patent practice, and not as a matter of strict liability." *N. Telecom, Inc.*, 908 F.2d at 939. In evaluating allegations of inequitable conduct, the Court must be mindful that a "patentee's oversights are easily magnified out of proportion by one accused of infringement" and the "ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive." *Id.* Even gross negligence is not itself sufficient to justify an inference of intent to deceive. *Halliburton Co.*, 925 F.2d at 1442.

216. "It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability."

*Allied Colloids,* 64 F.3d at 1578. And there can be no deceptive intent in not submitting to the PTO information that the applicant did not have. *Halliburton Co.,* 925 F.2d at 1442 (internal citations omitted).

217. Materiality does not presume intent, and intent to deceive cannot be inferred solely from the fact that information was not disclosed. *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1351–52 (Fed.Cir.2002) (holding that district court abused its discretion in finding inequitable conduct, and stating "Bartell argues, in essence, that the Red Rider was so material that its nondisclosure justifies an inference of intent to deceive. However, materiality does not presume intent, which is a separate and essential component of inequitable conduct") (internal quotations omitted); *Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1288–89 (Fed.Cir.2002) ("Catalina failed, however, to present any evidence that the applicant or his attorney intended to deceive the PTO. Instead, Catalina argues that intent can be inferred when knowledge and materiality are as strong as they are here. However, intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.") (internal quotations omitted); *Life Techs., Inc.,* 224 F.3d at 1324 ("Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence."); *Dayco Prods.,* 329 F.3d at 1366–67 ("While the '196 application meets the threshold level of materiality, however, TCI's motion for summary judgment did not establish a threshold showing of intent to deceive.... On the issue of intent, the district court also erred in concluding that the mere fact that the prosecuting attorney knew of the Wilson reference and decided not to submit it to the examiner established intent.").

218. There can be no inequitable conduct where applicants had a good faith belief that a document was confidential. *See Nordberg, Inc. v. Telsmith, Inc.,* 82 F.3d 394, 397–98 (Fed.Cir.1996) (holding there was no inequitable conduct because "the Nordberg employees who were under a duty of disclosure believed in good faith that the Tanner use occurred under a confidentiality agreement and thus was not material prior art").

219. Defendants have failed to prove by clear and convincing evidence that Freedom or Mr. von Hellens acted with an intent to deceive the Patent Office when they did not disclose the Cominex brochure.

220. Defendants have failed to prove by clear and convincing evidence that Freedom or Mr. von Hellens acted with an intent to deceive the Patent Office when they did not disclose the CSI proposal while the '067 patent was pending.

221. Defendants have failed to prove by clear and convincing evidence that Freedom acted with an intent to deceive in submitting the CSI proposal to the Patent Office during the '823 patent.

222. Defendants have failed to prove by clear and convincing evidence that Freedom acted with an intent to deceive the Patent Office when it did not disclose the Klepp article while the '823 patent was pending.

223. Defendants have failed to prove by clear and convincing evidence that Freedom acted with an intent to deceive the Patent Office when it did not disclose the Wise patent application separate from the Wise patent or information about Mr. Fougnies' visit to Banana Cellular.

## B. *Knowledge of Materiality*

224. Defendants must also prove that Freedom knew that the withheld references were material. *Warner–Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342-43 (Fed.Cir.2005) (" 'One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO.' "); *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed.Cir.2005) (reversing portion of finding of inequitable conduct based on failure to disclose advertisement of alleged contemporaneous invention because "[w]hile [inventor] had knowledge of the advertisement, its materiality was not readily determinable.... Although Neil's clipping of the advertisement and placing it in the Frazier patent application file is evidence that Neil thought the advertisement had some connection with the Frazier application, Neil's explanation that the reason he saved the advertisement was simply because it depicted a periscope lens similar to the P/F lens was credited by the district court").

225. Defendants have failed to prove by clear and convincing evidence that Mr. Fougnies would have known that Mr. Silvey's statements were material.

226. Defendants have failed to prove by clear and convincing evidence that Mr. Fougnies would have known that his visit to Banana Cellular was material.

227. Defendants have failed to prove by clear and convincing evidence that Mr. Harned would have known that his description about Cellexis' use of Feature Group D to Mr. Mrose in connection with the Fish & Richardson opinion letter was material.

## IV. EQUITY

228. "[A]n important step in the judicial resolution of inequitable conduct claims is for the court to determine whether the material misrepresentations or omissions in question are sufficiently serious in light of the evidence of intent to deceive, under all the circumstances, to warrant the severe sanction of holding the patent unenforceable. That determination is committed to the trial court's discretion." *Hoffmann–La Roche, Inc.*, 323 F.3d at 1372; *Duro–Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1110 (Fed.Cir. 2003) (affirming district court's decision of no inequitable conduct despite jury's findings of materiality and intent because "[t]he trial court then performed its own analysis, finding that the activity of [the patent holder] was 'marginally material' and that Duro–Last acted with 'little or no intent to deceive' "); *Am. Bioscience*, 333 F.3d at 1343 ("In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable.").

229. In light of all the circumstances, Freedom's conduct is not so culpable that its patents should be held unenforceable.

### CONCLUSION

For the reasons discussed above, the Court concludes that the Defendants have failed to prove by clear and convincing evidence that the '067 and '823 patents were obtained by inequitable conduct.

SO ORDERED.